COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Bray and Bumgardner
Argued at Salem, Virginia


COMMONWEALTH OF VIRGINIA
                                   MEMORANDUM OPINION[*] BY
v.    Record No. 0183-00-2         JUDGE RICHARD S. BRAY
                                         JUNE 29, 2000
ADIB AMEER MARZUQ


              FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                        Robert W. Duling, Judge

              Marla Graff Decker, Assistant Attorney
              General (Mark L. Earley, Attorney General, on
              brief), for appellant.

              Donald A. Denton for appellee.


     Indicted for possession of cocaine with intent to distribute,

Adib Ameer Marzuq (defendant) moved the trial court to suppress

inculpatory evidence discovered by police during a "sweep search"

of his residence.  Following a hearing on defendant's motion, the

court concluded the circumstances did not give rise to safety

concerns sufficient to justify the search and suppressed the

related evidence.  The Commonwealth appeals pursuant to Code

§ 19.2-398, arguing that the offending drugs, together with other

evidence, were properly seized during a "protective sweep."  We

agree and reverse the trial court.

---

     * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

I.

"It is well established that on appeal the burden is on the appellant[, the Commonwealth in this instance,] to show, considering the evidence in a light most favorable to [defendant], that the [granting] of a motion to suppress constitutes reversible error." Commonwealth v. Tart, 17 Va. App. 384, 390-91, 437 S.E.2d 219, 223 (1993). "Questions of reasonable suspicion and probable cause to make a warrantless search are subject to de novo review on appeal. 'In performing such analysis, we are bound by the trial court's findings of historical fact unless "plainly wrong" or without evidence to support them[.]'" Archer v. Commonwealth, 26 Va. App. 1, 8, 492 S.E.2d 826, 830 (1997) (citations omitted).

At approximately 11:30 a.m. on October 10, 1999, Richmond Police Officer Danny Rhodenizer, while investigating a "stolen dog call," accompanied two "complaining victims" to defendant's residence. Aware that "persons at [the] residence" were the subject of "active warrants," for unspecified offenses allegedly committed in both Richmond and Henrico County, Rhodenizer knocked at the "front door" of the home. "A young lady," later identified as defendant's aunt, appeared, and Rhodenizer asked "for . . . somebody that owned . . . a dog." In response, the aunt woke defendant and his girlfriend, Rita Raines, then asleep in the "far [rear] right bedroom,"[1] and advised defendant, owner of a boxer

_____

[1] A floor plan of the residence indicated that the front door opened into a dining and living room area, directly

-

dog, of the inquiry.  Defendant and Raines proceeded to the door,

spoke with Rhodenizer and company and, at Rhodenizer's request,

defendant retrieved the dog from the bedroom.  The "complaining

victims" confirmed that it was not the missing animal, apologized

for any inconvenience and left the residence.

While defendant was returning the dog to the bedroom, a radio

dispatch provided Rhodenizer with "several names for the active

warrants," including two men, one identified as Adib Marzuq.

Rhodenizer again "tapped on the screen door" and inquired of

Raines whether Adib Marzuq was "at the residence."  Raines once

more summoned defendant from the rear bedroom, and he "presented

his identification" to Rhodenizer, now "inside" the living room of

the home.  During the resulting exchange, Rhodenizer asked, "how

many people were in the house," and defendant responded, "him, Ms.

Raines and the lady on the couch [his aunt]."  Rhodenizer recalled

that defendant then appeared "nervous."

Defendant again returned to the bedroom, while Rhodenizer,

joined by two additional officers, was "confirming" the warrants.

However, within a "few minutes," Rhodenizer recalled defendant

from the bedroom into the living area and arrested and handcuffed

him.  Rhodenizer then noticed an unidentified man exit the

---

connected by a straight hallway to three bedrooms and a bath,
with doors clearly visible from the front door.  A kitchen, also
visible, was located at the left front of the house.

-

"[s]econd from the rear" bedroom, also located to the right of the hallway connecting the living and bedroom areas.

With defendant in custody, Rhodenizer determined to "sweep the area . . . for weapons, and . . . any other people in the house," and, accompanied by another officer, "walked back to the rear of the house." Upon entry into defendant's bedroom, a "small package of cocaine" was "immediately apparent . . . on top of the rear left dresser," and "a large amount" of cocaine was "in plain view in the [open] top drawer." The officers then "secured" the room, directed everyone present into the living area and sought a search warrant.[2]

When asked at the suppression hearing if fear of "people in the house" prompted the search, Rhodenizer testified, "I always have a basis to believe I'm potentially in danger." In recounting safety concerns peculiar to the instant circumstances, Rhodenizer noted that "other people were coming out of the the [sic] bedrooms," after defendant had represented otherwise, and "also the fact [he] had completely lost sight of [defendant and Raines] each time they go back to the bedroom, they close the door." Thus, Rhodenizer undertook the sweep search "to prevent [him] from being endangered" by persons and threats he was not "presently aware of."

---

[2] The officers later determined that the house was occupied by defendant, his aunt, brother, sister and her two children.

In granting defendant's motion to suppress, the trial court concluded that Rhodenizer "was not [in] the least bit concerned about his safety, other than to the extent that every police officer . . . in every circumstance has some concern about his safety." The court further reasoned that prompt removal of defendant from the premises following the arrest would have allayed any safety concerns. Relying upon the lessons of Maryland v. Buie, 494 U.S. 325 (1990), the Commonwealth appeals.

## II.

In Buie, police obtained arrest warrants for Buie and his alleged accomplice in an armed robbery, proceeded to Buie's home, entered the residence and apprehended Buie as he "emerged from the basement." Id. at 328. Police then "entered the basement 'in case there was someone else' down there" and observed and seized a "red running suit," clothing allegedly worn by a perpetrator of the robbery. Id. In reversing a decision of the Court of Appeals of Maryland that suppressed the evidence, the Supreme Court defined a "'protective sweep' . . . [as a] quick and limited search of premises, incident to an arrest," a "narrowly confined . . . cursory visual inspection of those places in which a person might be hiding," and approved the procedure to insure "the safety of police officers and others." Id. at 327.

Consistent with the rationale of Terry v. Ohio, 392 U.S. 1 (1968), and Michigan v. Long, 463 U.S. 1032 (1983), the Court recognized the "interest of [police] in taking steps to assure

-

themselves that the house in which a suspect is being, or has just been arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." Buie, 494 U.S. at 333. Thus, "as a precautionary matter and without probable cause or reasonable suspicion," police "could . . . look in closets and other spaces immediately adjoining the place of arrest[.]" Id. at 334. However, a search "[b]eyond that," while permissible, required "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id.; see Conway v. Commonwealth, 12 Va. App. 711, 720-21, 407 S.E.2d 310, 315 (1991).

Here, assuming, without deciding, that the disputed search extended into an area not "immediately adjoining the place of arrest," a reasonably prudent officer would have been justified in the belief that someone hidden in the hallway or adjacent rooms endangered persons on the scene.[3] The police had been advised that no fewer than two men residing at the address were the object of outstanding arrest warrants. A "nervous" defendant had not truthfully disclosed to police all persons present in the house, omitting an unidentified man observed by Rhodenizer exiting a

---

[3] Fourth Amendment jurisprudence "turns upon a 'reasonableness' determination" from an objective, rather than subjective, perspective. Whren v. United States, 517 U.S. 806, 817 (1996).

-

closed bedroom door and disappearing in the hallway area.  All doors opening into the hall had remained closed during the police activity in the living area, with defendant opening the door to his bedroom only to exit and re-enter.  Under such circumstances, Rhodenizer properly conducted the limited, cursory sweep countenanced by Buie.

Accordingly, we reverse the disputed order and remand the proceedings to the trial court.

Reversed and remanded.

-

Benton, J., dissenting.

The following principles govern our review:

> When we review a trial court's denial of a motion to suppress, "[w]e view the evidence in a light most favorable to . . . the prevailing party below, and we grant all reasonable inferences fairly deducible from that evidence." Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). In our analysis, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)).

McNair v. Commonwealth, 31 Va. App. 76, 81-82, 521 S.E.2d 303, 306 (1999). Although we must consider de novo the question whether the facts prove a seizure in violation of the Fourth Amendment, we cannot ignore our obligation to defer to the trial judge's findings of historical fact and inferences drawn from those facts. See Reittinger v. Commonwealth, ___ Va. ___, ___, ___ S.E.2d ___, ___ (2000).

Upon his consideration of the evidence, the trial judge found that the officer arrested Adib Ameer Marzuq "near the front door" and had no "right to go . . . into that [bed]room." The trial judge also specifically found that the evidence failed to prove an articulable basis upon which the officers could have reasonably had a safety concern. He found as follows:

> [I] had the opportunity to observe the officer when he testified and to hear what the officer said. Having observed the

-

> demeanor of the officer, I got the feeling
> that the officer was not the least bit
> concerned about his safety other than to the
> extent that every police officer to some
> extent in every circumstance has some
> concern about his safety.

The record supports those findings.

The evidence in the record proved that a police officer and two girls arrived at the door of Marzuq's residence to inquire about the girls' complaint of a lost or stolen dog. When informed by his aunt of the officer's presence, Marzuq and his female friend came to the door from his bedroom. After the officer instructed Marzuq to bring his dog to the door, Marzuq went to his bedroom and returned with the dog. Satisfied that the dog was not theirs, the girls left.

The police officer remained on the front porch of the residence and spoke on his radio while Marzuq returned the dog to his bedroom. After the officer tapped on the screen door, Marzuq's female friend again went to the door and spoke to the officer, who asked, "[Is] Adib Marzuq here at the residence?" She went to get Marzuq. When Marzuq returned to the front door, the officer asked for identification. After Marzuq went to get his identification, three officers entered the residence uninvited. The officers stood inside the residence within two or three feet of the front door. When Marzuq returned to the front door with identification, the police officers arrested him, "patted him down, [and] then placed him in handcuffs"

-

immediately inside the front door of the residence. The officers then "asked was anybody in the bedroom." When Marzuq said the dog was still there, the officers instructed his female friend to put the dog in the bathroom.

After the female walked down the hallway to the bedroom and moved the dog to the bathroom, two of the officers walked down the hallway and searched Marzuq's bedroom. The exhibit in the record establishes that the door of the bedroom is forty-eight feet from the front door of the house where the police arrested Marzuq.

The officer who arrested Marzuq testified that before he initially went to the door with the two girls, he learned that "there were persons at the residence that had active warrants in the City [of Richmond] and in Henrico County." He did not know the names of the persons or why the warrants had been issued. After the two girls left, the officer learned who "the warrants were for." Marzuq's female friend testified that the capias had been issued because Marzuq "didn't go to court."

The officer testified that after he entered the residence and arrested Marzuq, he and another officer went to the bedroom "to sweep the room . . . [for] weapons or . . . other people in the house." The officer's testimony cannot be read to suggest that he entered and swept the room because he believed Marzuq lied about the presence of another person in the house. Indeed, he testified as follows:

-

        Q:  Did you ask Mr. Marzuq if there was
        anybody else in that room?

        A:  I asked if there was anybody in the
        house.  They told me no; it was only the
        three of them.

        Q:  Are you sure the question was the house
        and not the room?

        A:  The room, the house, it possibly could
        have been the room, if there was anyone else
        in the room.

Viewed in the light most favorable to upholding the judge's factual findings, we must accept that the trial judge, as fact finder, believed that the officer's inquiry only concerned the bedroom.

     The officer also testified that neither the aunt nor Marzuq's female friend caused him any safety concerns.  He did not go to the bedroom because of any belief of danger.  In fact, he testified:  "I didn't believe I was in danger.  The point was not that I believed myself in danger, it was to prevent myself from being endangered that I'm not presently aware of."  The officer's testimony establishes that he went into the bedroom because he believed he was entitled to search the house.

     The facts in Maryland v. Buie, 494 U.S. 325 (1990), indicate that after two men committed an armed robbery of a restaurant, the police obtained a warrant to arrest Buie and a specifically named accomplice.  See id. at 328.  When the police entered Buie's home to arrest him, Buie was in his basement. The officers drew their guns and ordered everyone in the

-

basement to come out and show their hands.  Buie came from "around the bottom of the stairwell and . . . emerged from the basement."  Id. at 328.  The officers handcuffed him and then searched the basement for other persons.  See id.  Because Buie's accomplice in the robbery had not been arrested, the police entered the basement "to look for the suspected accomplice or anyone else who might pose a threat to the officers."  Id. at 329 (emphasis added).

Approving the search of the basement from which the officers commanded Buie to leave, the Supreme Court first noted the following limitation on the search of the residence:

> Possessing an arrest warrant and probable cause to believe Buie was in his home, the officers were entitled to enter and to search anywhere in the house in which Buie might be found.  Once he was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched.

Id. at 332-33.  The Court then stated the following rules that govern a limited search after the arrest:

> [A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.  Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area

-

>           to be swept harbors an individual posing a
>           danger to those on the arrest scene.

Id. at 334 (emphasis added).

Thus, the Supreme Court did not approve the use of protective sweeps beyond the immediate area of arrest whenever a person is arrested at a residence.  The Court held "that the Fourth Amendment would permit the protective sweep [beyond the area of arrest] . . . if the searching officer 'possesse[d] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing,' that the area swept harbored an individual posing a danger to the officer or others."  Id. at 327 (emphasis added) (citation omitted).  Indeed, the Supreme Court specifically rejected "[t]he State's argument that no level of objective justification should be required [to search beyond the spaces immediately adjoining the place of arrest] because of 'the danger that inheres in the in-home arrest for a violent crime.'"  Id. at 334 n.2 (citation omitted).

The record in this case established that the officers arrested Marzuq at the front door of the residence.  Contrary to the Buie rule, however, some of the officers then went to an area of the house beyond that space "immediately adjoining the place of arrest" to sweep search.  494 U.S. at 334.  They went from the foyer, down a hallway forty-eight feet long, and into

-

the bedroom. The officers could only do that if they possessed articulable facts which would have warranted a reasonable conclusion that "the [bedroom] . . . harbors an individual posing a danger" to the officers. Id. No objective facts proved that. All the evidence showed was that a "capias" of some kind was outstanding. Indeed, at the suppression hearing, the prosecutor "concede[d] it is not a warrant of any kind."

The officer further testified that he also was looking for weapons. Nothing in Buie extends the scope of the sweep to a search for weapons. Moreover, the officers had no reasonable basis to believe Marzuq had a weapon. The prosecutor conceded at trial that the evidence proved no "factors that . . . this gentleman is armed and dangerous."

Based on the evidence and the officer's demeanor, the trial judge found that the officers "allowed [Marzuq] to go back and forth, freely, on a number of occasions," that the officers did not "know . . . whether [the warrant] was for a felony . . . or misdemeanor . . . [or] for . . . failure to appear . . . of some type," and that, although the "officer . . . concluded that he wanted to sweep the area for . . . weapons and anyone else in the house[,] . . . the sweep seemed to concern only the back bedroom." The record supports the trial judge's finding that the officers had no basis to believe there was a threat to their safety. They simply told Marzuq and his female friend they

-

intended to search Marzuq's bedroom "like in a traffic stop; I can search your car."

As the Supreme Court ruled in Buie, however, a search in a residence "as an incident to the arrest" must be confined to "spaces immediately adjoining the place of arrest." 494 U.S. at 334. That search, designated as a "sweep," is limited to "spaces . . . from which an attack could be . . . launched," id., and, thus, by definition does not include a search for a weapon. As the Supreme Court further noted in Buie, no suspicion arises merely because an arrest occurs in a home, even if it is an "arrest for a violent crime," because "the existence of the arrest warrant implies nothing about whether dangerous third parties will be found in the arrestee's house." 494 U.S. at 334-35 n.2. In this case, the trial judge's finding that the officers had no information that any person in the house was dangerous is supported by the evidence. Moreover, the officers had no basis to believe anyone was in the bedroom. Although the prosecutor told the trial judge "that this is a very deminimis intrusion," the Supreme Court rejected that precise argument in Buie. See id.

As the trial judge found from the evidence, Marzuq was "in handcuffs" and "near the front door." Nothing in Buie allows the officers to search a bedroom forty-eight feet down a hallway from the place of arrest, when they had no articulable suspicion that a person who poses a danger to them might be there. As the

-

judge found, and the prosecutor conceded, the existence of a capias, standing alone, did not add any fact to the assessment of danger.  One of the officers who made the search testified that he was merely acting upon a generalized belief that a police officer must always be concerned about safety issues.  Thus, he went to the bedroom to look "for weapons and also to make sure there weren't any other people in the house."

Having concluded that there were no articulable facts that any person posed a danger, the judge also found as follows:

> [T]here was no need, nor any right, for the officer to go to that bedroom under those circumstances, to sweep the area for weapons; there being no evidence of [Marzuq] having demonstrated any conduct that would lead the officer to reasonably conclude that he or the other officers were in danger.  For that reason, I grant the motion to suppress.

The trial judge's findings were based upon credibility assessments of the witnesses and were not plainly wrong.

For these reasons, I would hold that the facts fail to support a sweep of the bedroom.  Thus, I would affirm the order suppressing the evidence.