## MARYLAND *v.* BUIE

No. 88–1369.   Argued December 4, 1989—Decided February 28, 1990

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., *post*, p. 337, and KENNEDY, J., *post*, p. 339, filed concurring opinions. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 339.

*Dennis M. Sweeney,* Deputy Attorney General of Maryland, argued the cause for petitioner. With him on the briefs were *J. Joseph Curran, Jr.,* Attorney General, *Gary E. Bair, Mary Ellen Barbera,* and *Ann N. Bosse,* Assistant Attorneys General, and *Alexander Williams, Jr.*

*Lawrence S. Robbins* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Dennis, Deputy Solicitor General Bryson,* and *Kathleen A. Felton.*

*John L. Kopolow* argued the cause for respondent. With him on the brief were *Alan H. Murrell, Michael R. Braudes, Nancy S. Forster*, and *Gary S. Offutt.**

JUSTICE WHITE delivered the opinion of the Court.

A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. In this case we must decide what level of justification is required by the Fourth and Fourteenth Amendments before police officers, while effecting the arrest of a suspect in his home pursuant to an arrest warrant, may conduct a warrantless protective sweep of all or part of the premises. The Court of Appeals of Maryland held that a running suit seized in plain view during such a protective sweep should have been suppressed at respondent's armed robbery trial because the officer who conducted the sweep did not have probable cause to believe that a serious and demonstrable potentiality for danger existed. 314 Md. 151, 166, 550 A. 2d 79, 86 (1988). We conclude that the Fourth Amendment would permit the protective sweep undertaken here if the searching officer "possesse[d] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing," *Michigan* v. *Long*, 463 U. S. 1032, 1049–1050 (1983) (quoting *Terry* v. *Ohio*, 392 U. S. 1, 21 (1968)), that the area swept harbored an individual posing a danger to the officer or others. We accordingly

*Gregory U. Evans, Daniel B. Hales, Emory A. Plitt, Jr., Judith A. Ronzio, George D. Webster, Jack E. Yelverton, Fred E. Inbau, Wayne W. Schmidt*, and *James P. Manak* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

*Ira Reiner, Harry B. Sondheim*, and *Eugene D. Tavris* filed a brief for the Appellate Committee of the California District Attorneys Association as *amicus curiae*.

vacate the judgment below and remand for application of this standard.

I

On February 3, 1986, two men committed an armed robbery of a Godfather's Pizza restaurant in Prince George's County, Maryland. One of the robbers was wearing a red running suit. That same day, Prince George's County police obtained arrest warrants for respondent Jerome Edward Buie and his suspected accomplice in the robbery, Lloyd Allen. Buie's house was placed under police surveillance.

On February 5, the police executed the arrest warrant for Buie. They first had a police department secretary telephone Buie's house to verify that he was home. The secretary spoke to a female first, then to Buie himself. Six or seven officers proceeded to Buie's house. Once inside, the officers fanned out through the first and second floors. Corporal James Rozar announced that he would "freeze" the basement so that no one could come up and surprise the officers. With his service revolver drawn, Rozar twice shouted into the basement, ordering anyone down there to come out. When a voice asked who was calling, Rozar announced three times: "this is the police, show me your hands." App. 5. Eventually, a pair of hands appeared around the bottom of the stairwell and Buie emerged from the basement. He was arrested, searched, and handcuffed by Rozar. Thereafter, Detective Joseph Frolich entered the basement "in case there was someone else" down there. *Id.*, at 14. He noticed a red running suit lying in plain view on a stack of clothing and seized it.

The trial court denied Buie's motion to suppress the running suit, stating in part: "The man comes out from a basement, the police don't know how many other people are down there. He is charged with a serious offense." *Id.*, at 19. The State introduced the running suit into evidence at Buie's trial. A jury convicted Buie of robbery with a deadly weapon and using a handgun in the commission of a felony.

The Court of Special Appeals of Maryland affirmed the trial court's denial of the suppression motion. The court stated that Detective Frolich did not go into the basement to search for evidence, but to look for the suspected accomplice or anyone else who might pose a threat to the officers on the scene. 72 Md. App. 562, 571–572, 531 A. 2d 1290, 1295 (1987).

> "Traditionally, the sanctity of a person's home—his castle—requires that the police may not invade it without a warrant except under the most exigent of circumstances. But once the police are lawfully within the home, their conduct is measured by a standard of reasonableness . . . . [I]f there is reason to believe that the arrestee had accomplices who are still at large, something less than probable cause—reasonable suspicion—should be sufficient to justify a *limited additional intrusion* to investigate the *possibility* of their presence." *Id.*, at 575–576, 531 A. 2d, at 1297 (emphasis in original).

The Court of Appeals of Maryland reversed by a 4-to-3 vote. 314 Md. 151, 550 A. 2d 79 (1988). The court acknowledged that "when the intrusion is slight, as in the case of a brief stop and frisk on a public street, and the public interest in prevention of crime is substantial, reasonable articulable suspicion may be enough to pass constitutional muster," *id.*, at 159, 550 A. 2d, at 83. The court, however, stated that when the sanctity of the home is involved, the exceptions to the warrant requirement are few, and held: "[T]o justify a protective sweep of a home, the government must show that there is probable cause to believe that ' "a serious and demonstrable potentiality for danger" ' exists." *Id.*, at 159–160, 550 A. 2d, at 83 (citation omitted). The court went on to find that the State had not satisfied that probable-cause requirement. *Id.*, at 165–166, 550 A. 2d, at 86. We granted certiorari, 490 U. S. 1097 (1989).

## II

It is not disputed that until the point of Buie's arrest the police had the right, based on the authority of the arrest warrant, to search anywhere in the house that Buie might have been found, including the basement. "If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." *Payton* v. *New York,* 445 U. S. 573, 602–603 (1980). There is also no dispute that if Detective Frolich's entry into the basement was lawful, the seizure of the red running suit, which was in plain view and which the officer had probable cause to believe was evidence of a crime, was also lawful under the Fourth Amendment. See *Arizona* v. *Hicks,* 480 U. S. 321, 326 (1987). The issue in this case is what level of justification the Fourth Amendment required before Detective Frolich could legally enter the basement to see if someone else was there.

Petitioner, the State of Maryland, argues that, under a general reasonableness balancing test, police should be permitted to conduct a protective sweep whenever they make an in-home arrest for a violent crime. As an alternative to this suggested bright-line rule, the State contends that protective sweeps fall within the ambit of the doctrine announced in *Terry* v. *Ohio,* 392 U. S. 1 (1968), and that such sweeps may be conducted in conjunction with a valid in-home arrest whenever the police reasonably suspect a risk of danger to the officers or others at the arrest scene. The United States, as *amicus curiae* supporting the State, also argues for a *Terry*-type standard of reasonable, articulable suspicion of risk to the officer, and contends that that standard is met here. Respondent argues that a protective sweep may not be undertaken without a warrant unless the exigencies of the situation render such warrantless search objectively reasonable. According to Buie, because the State has shown neither exigent circumstances to immediately enter Buie's house

nor an unforeseen danger that arose once the officers were in the house, there is no excuse for the failure to obtain a search warrant to search for dangerous persons believed to be on the premises. Buie further contends that, even if the warrant requirement is inapplicable, there is no justification for relaxing the probable-cause standard. If something less than probable cause is sufficient, respondent argues that it is no less than individualized suspicion—specific, articulable facts supporting a reasonable belief that there are persons on the premises who are a threat to the officers. According to Buie, there were no such specific, articulable facts to justify the search of his basement.

## III

It goes without saying that the Fourth Amendment bars only unreasonable searches and seizures, *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602 (1989). Our cases show that in determining reasonableness, we have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *United States* v. *Villamonte-Marquez*, 462 U. S. 579, 588 (1983); *Delaware* v. *Prouse*, 440 U. S. 648, 654 (1979). Under this test, a search of the house or office is generally not reasonable without a warrant issued on probable cause. There are other contexts, however, where the public interest is such that neither a warrant nor probable cause is required. *Skinner, supra*, at 619–620; *Griffin* v. *Wisconsin*, 483 U. S. 868, 873 (1987); *New Jersey* v. *T. L. O.*, 469 U. S. 325, 340–341 (1985); *Terry* v. *Ohio*, 392 U. S., at 20.

The *Terry* case is most instructive for present purposes. There we held that an on-the-street "frisk" for weapons must be tested by the Fourth Amendment's general proscription against unreasonable searches because such a frisk involves "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical

matter could not be, subjected to the warrant procedure." *Ibid.* We stated that there is "'no ready test for determining reasonableness other than by balancing the need to search . . . against the invasion which the search . . . entails.'" *Id.*, at 21 (quoting *Camara* v. *Municipal Court of San Francisco*, 387 U. S. 523, 536–537 (1967)). Applying that balancing test, it was held that although a frisk for weapons "constitutes a severe, though brief, intrusion upon cherished personal security," 392 U. S., at 24–25, such a frisk is reasonable when weighed against the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." *Id.*, at 24. We therefore authorized a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on "specific and articulable facts," *id.*, at 21, and not on a mere "inchoate and unparticularized suspicion or 'hunch,'" *id.*, at 27, "that he is dealing with an armed and dangerous individual," *ibid.*

In *Michigan* v. *Long*, 463 U. S. 1032 (1983), the principles of *Terry* were applied in the context of a roadside encounter: "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.*, at 1049–1050 (quoting *Terry, supra,* at 21). The *Long* Court expressly rejected the contention that *Terry* restricted preventative searches to the person of a detained suspect. 463 U. S., at 1047. In a sense, *Long* authorized a "frisk" of an automobile for weapons.

The ingredients to apply the balance struck in *Terry* and *Long* are present in this case. Possessing an arrest warrant and probable cause to believe Buie was in his home, the offi-

cers were entitled to enter and to search anywhere in the house in which Buie might be found. Once he was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched.

That Buie had an expectation of privacy in those remaining areas of his house, however, does not mean such rooms were immune from entry. In *Terry* and *Long* we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them. In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

We recognized in *Terry* that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry, supra,* at 24–25. But we permitted the intrusion, which was no more than necessary to protect the officer from harm. Nor do we here suggest, as the State

does, that entering rooms not examined prior to the arrest is a *de minimis* intrusion that may be disregarded. We are quite sure, however, that the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and while making, the arrest. That interest is sufficient to outweigh the intrusion such procedures may entail.

We agree with the State, as did the court below, that a warrant was not required.[1] We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and *Long*, and as in those cases, we think this balance is the proper one.[2]

---

[1] Buie suggests that because the police could have sought a warrant to search for dangerous persons in the house, they were constitutionally required to do so. But the arrest warrant gave the police every right to enter the home to search for Buie. Once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep.

[2] The State's argument that no level of objective justification should be required because of "the danger that inheres in the in-home arrest for a violent crime," Brief for Petitioner 23, is rebutted by *Terry* v. *Ohio*, 392 U. S. 1 (1968), itself. The State argues that "[o]fficers facing the life threatening situation of arresting a violent criminal in the home should not be forced to pause and ponder the legal subtleties associated with a quantum of proof analysis," Brief for Petitioner 23. But despite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, the Court in *Terry* did not adopt a bright-line rule authorizing frisks for weapons in all confrontational encounters. Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion

We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.[3]  The sweep lasts no longer

before a frisk for weapons can be conducted.  That approach is applied to the protective sweep of a house.

We reject the State's attempts to analogize this case to *Pennsylvania* v. *Mimms,* 434 U. S. 106 (1977) *(per curiam),* and *Michigan* v. *Summers,* 452 U. S. 692 (1981).  The intrusion in *Mimms*—requiring the driver of a lawfully stopped vehicle to exit the car—was *"de minimis,"* 434 U. S., at 111.  *Summers* held that a search warrant for a house carries with it the authority to detain its occupants until the search is completed.  The State contends that this case is the "mirror image" of *Summers* and that the arrest warrant carried with it the authority to search for persons who could interfere with the arrest.  In that case, however, the search warrant implied a judicial determination that police had probable cause to believe that someone in the home was committing a crime.  Here, the existence of the arrest warrant implies nothing about whether dangerous third parties will be found in the arrestee's house.  Moreover, the intrusion in *Summers* was less severe and much less susceptible to exploitation than a protective sweep.  A more analogous case is *Ybarra* v. *Illinois,* 444 U. S. 85 (1979), in which we held that, although armed with a warrant to search a bar and bartender, the police could not frisk the bar's patrons absent individualized, reasonable suspicion that the person to be frisked was armed and presently dangerous.  Here, too, the reasonable suspicion standard—"one of the relatively simple concepts embodied in the Fourth Amendment," *United States* v. *Sokolow,* 490 U. S. 1 (1989)—strikes the proper balance between officer safety and citizen privacy.

   [3] Our reliance on the cursory nature of the search is not inconsistent with our statement in *Arizona* v. *Hicks,* 480 U. S. 321 (1987), that "[a] search is a search," *id.,* at 325, or with our refusal in *Hicks* to sanction a standard less than probable cause on the ground that the search of a stereo was a "cursory inspection," rather than a "full-blown search," *id.,* at 328. When the officer in *Hicks* moved the turntable to look at its serial number, he was searching for evidence plain and simple.  There was no interest in officer safety or other exigency at work in that search.  A protective sweep is without question a "search," as was the patdown in *Terry, supra,* at 16; they are permissible on less than probable cause only because they are limited to that which is necessary to protect the safety of officers and others.

than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

## IV

Affirmance is not required by *Chimel* v. *California*, 395 U. S. 752 (1969), where it was held that in the absence of a search warrant, the justifiable search incident to an in-home arrest could not extend beyond the arrestee's person and the area from within which the arrestee might have obtained a weapon. First, *Chimel* was concerned with a full-blown search of the entire house for evidence of the crime for which the arrest was made, see *id.*, at 754, 763, not the more limited intrusion contemplated by a protective sweep. Second, the justification for the search incident to arrest considered in *Chimel* was the threat posed by the arrestee, not the safety threat posed by the house, or more properly by unseen third parties in the house. To reach our conclusion today, therefore, we need not disagree with the Court's statement in *Chimel, id.*, at 766–767, n. 12, that "the invasion of privacy that results from a top-to-bottom search of a man's house [cannot be characterized] as 'minor,'" nor hold that "simply because some interference with an individual's privacy and freedom of movement has lawfully taken place, further intrusions should automatically be allowed despite the absence of a warrant that the Fourth Amendment would otherwise require," *ibid.* The type of search we authorize today is far removed from the "top-to-bottom" search involved in *Chimel;* moreover, it is decidedly not "automati[c]," but may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene.

## V

We conclude that by requiring a protective sweep to be justified by probable cause to believe that a serious and demonstrable potentiality for danger existed, the Court of Ap-

peals of Maryland applied an unnecessarily strict Fourth Amendment standard. The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene. We therefore vacate the judgment below and remand this case to the Court of Appeals of Maryland for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

Today the Court holds that reasonable suspicion, rather than probable cause, is necessary to support a protective sweep while an arrest is in progress. I agree with that holding and with the Court's opinion, but I believe it is important to emphasize that the standard applies only to *protective* sweeps. Officers conducting such a sweep must have a reasonable basis for believing that their search will reduce the danger of harm to themselves or of violent interference with their mission; in short, the search must be protective.

In this case, to justify Officer Frolich's entry into the basement, it is the State's burden to demonstrate that the officers had a reasonable basis for believing not only that someone in the basement might attack them or otherwise try to interfere with the arrest, but also that it would be safer to go down the stairs instead of simply guarding them from above until respondent had been removed from the house. The fact that respondent offered no resistance when he emerged from the basement is somewhat inconsistent with the hypothesis that the danger of an attack by a hidden confederate persisted after the arrest. Moreover, Officer Rozar testified that he was not worried about any possible danger when he arrested Buie. App. 9.[1] Officer Frolich, who conducted the search,

---

[1] Buie's attorney asked, "'You weren't worried about there being any danger or anything like that?'" Officer Rozar answered, "'No.'" App. 9.

supplied no explanation for why he might have thought another person was in the basement. He said only that he "had no idea who lived there." *Id.*, at 15. This admission is made telling by Officer Frolich's participation in the 3-day prearrest surveillance of Buie's home. *Id.*, at 4. The Maryland .Court of Appeals was under the impression that the search took place after "Buie was safely outside the house, handcuffed and unarmed." 314 Md. 151, 166, 550 A. 2d 79, 86 (1988). All of this suggests that no reasonable suspicion of danger justified the entry into the basement.

Indeed, were the officers concerned about safety, one would expect them to do what Officer Rozar did before the arrest: guard the basement door to prevent surprise attacks. App. 5. As the Court indicates, Officer Frolich might, at the time of the arrest, reasonably have "look[ed] in" the already open basement door, *ante*, at 334, to ensure that no accomplice had followed Buie to the stairwell. But Officer Frolich did not merely "look in" the basement; he entered it.[2] That strategy is sensible if one wishes to search the basement. It is a surprising choice for an officer, worried about safety, who need not risk entering the stairwell at all.

The State may thus face a formidable task on remand. However, the Maryland courts are better equipped than are we to review the record. See, *e. g.*, 314 Md., at 155, n. 2, 550 A. 2d, at 81, n. 2 (discussing state-law rules restricting review of the record on appeal of suppression decisions); cf. *United States* v. *Hasting*, 461 U. S. 499, 516–518 (1983) (STEVENS, J., dissenting) (This Court should avoid undertaking record review functions that can "better be performed by other judges"). Moreover, the Maryland Court of Special

---

[2] What more the officers might have done to protect themselves against threats from other places is obviously a question not presented on the facts of this case, and so is not one we can answer. Indeed, the peculiarity of Officer Frolich's search is that it appears to have concentrated upon the part of the house least likely to make the departing officers vulnerable to attack.

Appeals suggested that Officer Frolich's search could survive a "reasonable suspicion" test, 72 Md. App. 562, 576, 531 A. 2d 1290, 1297 (1987), and the Maryland Court of Appeals has not reviewed this conclusion. I therefore agree that a remand is appropriate.

JUSTICE KENNEDY, concurring.

The Court adopts the prudent course of explaining the general rule and permitting the state court to apply it in the first instance. The concurrence by JUSTICE STEVENS, however, makes the gratuitous observation that the State has a formidable task on remand. My view is quite to the contrary. Based on my present understanding of the record, I should think the officers' conduct here was in full accord with standard police safety procedure, and that the officers would have been remiss if they had not taken these precautions. This comment is necessary, lest by acquiescence the impression be left that JUSTICE STEVENS' views can be interpreted as authoritative guidance for application of our ruling to the facts of the case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Today the Court for the first time extends *Terry* v. *Ohio*, 392 U. S. 1 (1968), into the home, dispensing with the Fourth Amendment's general requirements of a warrant and probable cause and carving a "reasonable suspicion" exception for protective sweeps in private dwellings. In *Terry, supra,* the Court held that a police officer may briefly detain a suspect based on a reasonable suspicion of criminal activity and may conduct a limited "frisk" of the suspect for concealed weapons in order to protect herself from personal danger. The Court deemed such a frisk "reasonable" under the Fourth Amendment in light of the special "need for law enforcement officers to protect themselves and other prospective victims of violence" during investigative detentions, *id.*, at 24, and the

"brief, though far from inconsiderable, intrusion upon the sanctity of the person." *Id.*, at 26.

*Terry* and its early progeny "permit[ted] only brief investigative stops and extremely limited searches based on reasonable suspicion." *United State* v. *Place,* 462 U. S. 696, 714 (1983) (BRENNAN, J., concurring in result). But this Court more recently has applied the rationale underlying *Terry* to a wide variety of more intrusive searches and seizures,[1] prompting my continued criticism of the "'emerging tendency on the part of the Court to convert the *Terry* decision'" from a narrow exception into one that "'swallow[s] the general rule that [searches] are "reasonable" only if based on probable cause.'" *Place, supra,* at 719 (BRENNAN, J., concurring in result) (citations omitted).

The Court today holds that *Terry*'s "reasonable suspicion" standard "strikes the proper balance between officer safety and citizen privacy" for protective sweeps in private dwellings. *Ante,* at 335, n. 2. I agree with the majority that officers executing an arrest warrant within a private dwelling have an interest in protecting themselves against potential ambush by third parties, see *ante,* at 333, but the majority offers no support for its assumption that the danger of ambush during planned home arrests approaches the danger of unavoidable "on-the-beat" confrontations in "the myriad daily situations in which policemen and citizens confront each other on the street." *Terry, supra,* at 12.[2] In any event,

---

[1] The Court has recently relied on *Terry* to relax the warrant and probable-cause requirements for both searches of places, *e. g., New York* v. *Class,* 475 U. S. 106 (1986) (search of car interior); *Michigan* v. *Long,* 463 U. S. 1032 (1983) (same); and seizures of personal effects, *e. g., New Jersey* v. *T. L. O.,* 469 U. S. 325 (1985) (search of student's purse); *United States* v. *Place,* 462 U. S. 696 (1983) (seizure of luggage).

[2] Individual police officers necessarily initiate street encounters without advance planning "for a wide variety of purposes." *Terry* v. *Ohio,* 392 U. S., at 13. But officers choosing to execute an arrest warrant in the suspect's house may minimize any risk of ambush by, for example, a show

the Court's implicit judgment that a protective sweep constitutes a "minimally intrusive" search akin to that involved in *Terry* markedly undervalues the nature and scope of the privacy interests involved.

While the Fourth Amendment protects a person's privacy interests in a variety of settings, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States* v. *United States District Court, Eastern District of Michigan,* 407 U. S. 297, 313 (1972).[3] The Court discounts the nature of the intrusion because it believes that the scope of the intrusion is limited. The Court explains that a protective sweep's scope is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," *ante,* at 327, and confined in duration to a period "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Ante,* at 335–336.[4] But these spatial and temporal

of force; in this case, at least six armed officers secured the premises. And, of course, officers could select a safer venue for making their arrest.

[3] Here the officers' arrest warrant for Buie and their probable cause to believe he was present in the house authorized their initial entry. But, as the majority concedes, "[o]nce he was found . . . the search for him was over," and "Buie had an expectation of privacy in those remaining areas of his house." *Ante,* at 333. The fact that some areas were necessarily exposed to the police during Buie's arrest thus does not diminish his privacy interest in the remaining rooms. See *Chimel* v. *California,* 395 U. S. 752, 767, n. 12 (1969) ("[W]e can see no reason why, simply because some interference with an individual's privacy and freedom of movement has lawfully taken place, further intrusions should automatically be allowed despite the absence of a warrant that the Fourth Amendment would otherwise require").

[4] The protective sweep in this case may have exceeded the permissible temporal scope defined by the Court. The Court of Appeals of Maryland expressly noted that "at the time of the warrantless search, Buie was safely outside the house, handcuffed and unarmed." 314 Md. 151, 166, 550 A. 2d 79, 86 (1988). On remand, therefore, the state court need not decide whether the "reasonable suspicion" standard is satisfied in this case should it determine that the sweep of the basement took place after the police had

restrictions are not particularly limiting. A protective sweep would bring within police purview virtually all personal possessions within the house not hidden from view in a small enclosed space. Police officers searching for potential ambushers might enter every room including basements and attics; open up closets, lockers, chests, wardrobes, and cars; and peer under beds and behind furniture. The officers will view letters, documents, and personal effects that are on tables or desks or are visible inside open drawers; books, records, tapes, and pictures on shelves; and clothing, medicines, toiletries and other paraphernalia not carefully stored in dresser drawers or bathroom cupboards. While perhaps not a "full-blown" or "top-to-bottom" search, *ante*, at 336, a protective sweep is much closer to it than to a "limited patdown for weapons" or a "'frisk' of an automobile." *Ante*, at 332.[5] Because the nature and scope of the intrusion sanctioned here are far greater than those upheld in *Terry* and *Long*, the Court's conclusion that "[t]he ingredients to apply the balance struck in *Terry* and *Long* are present in this case," *ibid.*, is unwarranted. The "ingredient" of a minimally intrusive search is absent, and the Court's holding today therefore unpalatably deviates from *Terry* and its progeny.[6]

---

sufficient time to "complete the arrest and depart the premises." *Ante*, at 336.

[5] Indeed, a protective sweep is sufficiently broad in scope that today's ruling might encourage police officers to execute arrest warrants in suspects' homes so as to take advantage of the opportunity to peruse the premises for incriminating evidence left in "plain view." This incentive runs directly counter to our central tenet that "in [no setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms." *Payton* v. *New York*, 445 U. S. 573, 589 (1980).

[6] The Court's decision also to expand the "search incident to arrest" exception previously recognized in *Chimel* v. *California, supra,* allowing police officers without *any* requisite level of suspicion to look into "closets and other spaces immediately adjoining the place of arrest from which an at-

In light of the special sanctity of a private residence and the highly intrusive nature of a protective sweep, I firmly believe that police officers must have probable cause to fear that their personal safety is threatened by a hidden confederate of an arrestee before they may sweep through the entire home. Given the state-court determination that the officers searching Buie's home lacked probable cause to perceive such a danger and therefore were not lawfully present in the basement, I would affirm the state court's decision to suppress the incriminating evidence. I respectfully dissent.

---

tack could be immediately launched," *ante,* at 334, is equally disquieting. *Chimel* established that police officers may presume as a matter of law, without need for factual support in a particular case, that arrestees might take advantage of weapons or destroy evidence in the area "within [their] immediate control"; therefore, a protective search of that area is *per se* reasonable under the Fourth Amendment. *Chimel, supra,* at 763. I find much less plausible the Court's implicit assumption today that arrestees are likely to sprinkle hidden allies throughout the rooms in which they might be arrested. Hence there is no comparable justification for permitting arresting officers to presume as a matter of law that they are threatened by ambush from "immediately adjoining" spaces.