**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0281n.06
Filed: April 13, 2005

**No. 04-1328**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DWAIN PERKINS, | ) | |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| UNITED STATES OF AMERICA, | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Plaintiff-Appellee. | ) | |

Before:  MOORE and SUTTON, Circuit Judges; CARMAN, Judge.[*]

SUTTON, Circuit Judge.  Dwain Perkins pleaded guilty to possession with intent to distribute cocaine, and the district court sentenced him to 80 months in prison.  Perkins' plea agreement reserved the right to appeal the district court's denial of his motion to suppress evidence that police obtained during a protective sweep of his residence.  Because the officers' protective sweep was consistent with *Maryland v. Buie*, 494 U.S. 325 (1990), and with our cases applying *Buie*, we affirm.

I.

---

[*] The Honorable Gregory W. Carman, Judge for the United States Court of International Trade, sitting by designation.

On March 28, 2001, a confidential informant told Michigan police officers that Perkins had called him the day before and told him that a female would be delivering guns to him. According to the informant, Perkins asked him to transport guns to Chicago and return to Michigan with nine ounces of cocaine. Shortly after that conversation, a female arrived at the informant's residence and delivered four revolvers in a maroon backpack.

The officers instructed the informant not to proceed with the transaction but to bring the guns to them. The informant complied, and the officers determined that three of the four guns had been stolen. At this point, the informant told Perkins that he had a family emergency in Florida and would not be able to bring the guns to Chicago but that he would store them for Perkins at a secure location in Big Bay, Michigan.

On April 5, 2001, the informant contacted the officers and told them that Perkins had asked him to bring the guns to 1449 Lynn Street in Marquette, Michigan. The informant told police that he had reminded Perkins that Perkins still owed him eight grams of cocaine from a prior transaction and that Perkins had said he would provide the cocaine if the informant brought the guns to the residence. The informant agreed to call Perkins later that evening to schedule a time to deliver the guns. According to the informant, Perkins also told him to bring enough money to purchase one ounce of cocaine.

In anticipation of the controlled delivery—by which the informant would deliver guns to, and receive cocaine from, Perkins—the officers set up a surveillance at 1449 Lynn Street where they had

spotted Perkins' car several times before (during prior surveillances) and where Perkins had told the informant he was staying. Prior to the controlled delivery, the officers also obtained an anticipatory search warrant to seize the maroon backpack containing the four guns from the residence after the informant delivered them to Perkins.

At approximately 8:00 p.m. that evening, the officers observed Perkins and another male, later identified as Nathaniel Edgecomb, enter the residence. They instructed the informant to call the residence. An unidentified woman answered the phone and told the informant that Perkins and Edgecomb were out of town. At approximately 8:10 p.m., the informant met with the officers outside the residence. They patted him down to ensure that he was free of any controlled substances, gave him the backpack with the guns and provided him with $1,200 in funds to purchase cocaine from Perkins. The officers observed the informant enter the residence. At approximately 8:20 p.m., the informant left the residence without the backpack and gave the cocaine he had purchased to the officers.

Shortly thereafter, the officers executed the search warrant to retrieve the guns. The officers confronted Perkins as he was trying to leave the residence in his car, detained him at the scene and entered the residence to execute the warrant. Upon entry, the officers' "first action was to secure the residence and to identify any persons who might be present." JA 129. Shortly after entering the residence, the officers located Edgecomb and secured him while they looked for the backpack. They eventually located the backpack in the kitchen but did not see the woman who had answered the telephone roughly twenty minutes earlier. During the protective sweep of the area, one officer went

into the basement and in plain view observed a green tray with a plastic bag containing a quantity of marijuana as well as a digital scale.

Based upon the evidence obtained from the controlled purchase and from the seizure of marijuana and the digital scale in the basement, the officers obtained a second warrant to search the residence for drugs and drug-related materials. In connection with the second search, the officers found additional controlled substances (including cocaine), a spoon with a white residue and the $1,200 that the informant had used to purchase the cocaine.

A federal grand jury indicted Perkins on April 25, 2001, and returned a superceding indictment on May 30, 2001, charging him with one count of distributing a "substance containing a detectable amount of cocaine," one count of possession "with intent to distribute 5 grams or more of a mixture or substance containing cocaine base," one count of possession "with intent to distribute a mixture or substance containing a detectable amount of cocaine" and one count of being a felon in possession of a firearm. JA 20–23.

Perkins moved to suppress the evidence seized during the protective sweep and during the execution of the second search warrant. The magistrate judge recommended that the motion be denied, and the district judge, adopting the magistrate judge's report and recommendation, denied the motion.

The government and Perkins eventually reached a plea agreement. Perkins pleaded guilty to one count in the superseding indictment—possession with intent to distribute five grams or more of

crack cocaine in violation of 21 U.S.C. § 841(a)(1)—in return for which the government agreed to drop the remaining counts in the indictment. The plea agreement also permitted Perkins to seek review of the denial of his motion to suppress the evidence.

On May 20, 2002, the court sentenced Perkins to an 80-month prison term and to five years of supervised release. Although Perkins intended to appeal the judgment, his attorney failed to file a timely notice of appeal. As a result, Perkins filed a § 2255 motion, claiming ineffective assistance of counsel and claiming that his criminal history category had been miscalculated at sentencing. On March 1, 2004, the district court granted Perkins' motion, vacated his original sentence and sentenced him to a 60-month prison term and four years of supervised release. Perkins filed a notice of appeal on March 4, 2004, which perhaps unsurprisingly was filed seven days ahead of the deadline.

II.

The sole issue raised by Perkins on appeal is whether some of the evidence seized by the police during the protective sweep of the residence—the marijuana and the scale—should have been suppressed because the scope of the sweep violated Perkins' Fourth Amendment rights. We review a district court's conclusions of law on a motion to suppress de novo and its findings of fact for clear error. *United States v. Hammond*, 351 F.3d 765, 770 (6th Cir. 2003). And when reviewing the denial of a motion to suppress, we consider the evidence regarding the search in a light most favorable to the government. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

Ever since *Maryland v. Buie*, 494 U.S. 325, 327 (1990), it has been clear that police officers may conduct a "protective sweep" of a residence in the course of making an arrest without running afoul of the Fourth Amendment's prohibition against "unreasonable searches and seizures," U.S. Const. amend. IV. As the phrase implies, however, such sweeps are limited by the police-protection concern that animates them. A "quick and limited search," *Buie* holds, is permitted "to protect the safety of police officers" when they "possess[] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[] the officer[s] in believing that the area swept harbor[s] an individual posing a danger to the officer[s] or others." *Buie*, 494 U.S. at 327 (quotation and citations omitted).

In *Buie*, two men, one of whom was wearing a red running suit, robbed a pizza restaurant. *Id.* at 328. The officers obtained an arrest warrant for Buie and another individual. Before executing the arrest warrant for Buie, the officers had a police department secretary telephone Buie's residence to verify that he was home. The secretary initially talked to a female, then spoke to Buie himself. Officers entered Buie's house, searched the first and second floors, and secured the basement door so that no one could come up from the basement and surprise the officers. The police announced their presence and ordered anyone in the basement to come upstairs. Buie eventually emerged from the basement and was arrested, searched and hand-cuffed. One officer then "entered the basement 'in case there was someone else' down there." *Id.* While the officer did not find anyone else in the basement, he did see a red running suit in plain view and seized it. *Id.*

The Supreme Court rejected Buie's effort to suppress the running suit, holding that

> as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, . . . there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334. In upholding the search, the Court reasoned further that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf'" because "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.* at 333.

In the fifteen years since *Buie*, this circuit has had several opportunities to apply the decision. And in each instance that the officers had a reasonable belief that another person (besides the seized individual) was on the premises and posed a threat to the officers who were making the arrest the court has *upheld* a protective sweep incident to the arrest. In *United States v. Biggs*, 70 F.3d 913 (6th Cir. 1995), the suspect was a fugitive, and officers set up a surveillance outside of his motel room. *Id.* at 915. After Biggs exited the room, the officers placed him in custody in the parking lot. Two of the officers then went inside his motel room through the partially opened door and conducted a protective sweep of the room, during which they found a gun in plain view. In upholding the protective sweep, the court reasoned that the officers had pointed to specific articulable facts that would warrant "a reasonably prudent officer to believe that the officers might be in danger from someone in the motel room": Namely, the officers had been told that someone would be meeting Biggs at the motel room; Biggs left the door open so that anyone in the motel room would have a

clear view of the officers; and the officers knew that Biggs had been arrested on two previous occasions in the presence of someone with a firearm. *Id.* at 916.

In *United States v. Taylor*, 248 F.3d 506, 510 (6th Cir. 2001), the officers heard shuffling noises inside Taylor's apartment before Taylor's brother, Hill, permitted them into the apartment. Upon seeing a marijuana stem in plain view, the officers informed Hill that they would secure the residence until they could obtain a search warrant. Even though Hill had assured the officers that no one else was in the apartment (he claimed Taylor was at the gym), the officers conducted a protective sweep of the apartment. During the sweep, an officer located Taylor hiding in the bathroom and in opening a nearby closet found an open duffle bag revealing several bags of marijuana. *Id.* at 510. In rejecting Taylor's Fourth Amendment claim, the court noted the following legitimate explanations for the protective sweep: The officers had heard shuffling noises inside the apartment, suggesting the presence of more than one person in the apartment; a report from local police indicated that Taylor was believed to be a drug and weapons dealer and that he was suspected of involvement in more than one murder; and Hill's demeanor indicated that he was trying to hide something. *Id.* at 514.

In *United States v. Bass*, 315 F.3d 561 (6th Cir. 2002), officers received a report that a male had fired gunshots at two other males and retreated into an apartment. *Id.* at 563. The officers knocked on the apartment door, and a woman answered. When asked who else was present in the apartment, she responded that her husband and children were present. When a man came into the living room, police handcuffed him and proceeded to conduct a protective sweep of the apartment.

One officer lifted the box springs of a bed to see if anyone was hiding underneath it and when dropping the bed back into place, he spotted a sawed-off shotgun hidden between the box springs and the mattress. The court upheld the search because the officers were not sure that the man that they had handcuffed was the shooter, they had reason to believe there was a loaded weapon in the apartment and the woman's description of the apartment's occupants left open the possibility that other people remained in the apartment. *Id.* at 564. *See also United States v. Talley*, 275 F.3d 560, 564 (6th Cir. 2001) (protective sweep of residence was justified when officers had articulable reason to believe that others were in the house); *compare United States v. Colbert*, 76 F.3d 773, 777–78 (6th Cir. 1996) (protective sweep of apartment after defendant was arrested outside was unreasonable as the officers had no information that additional individuals may have been present in the apartment).

As in these cases and as in *Buie* itself, the officers in today's case pointed to "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. The officers established a surveillance of the property and saw Perkins and Edgecomb enter the residence. The informant called the residence, and a woman answered the phone. The officers arrested Perkins outside of the home and had little trouble seizing Edgecomb and eventually the guns upon entering the residence. The woman who had answered the phone was nowhere immediately to be seen, and accordingly the officers had "articulable facts" that "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Adding to the officers'

concern, they could reasonably believe that Perkins and his companions had ready access to weapons—remember, he had just asked the informant to transport stolen weapons for him—and accordingly could reasonably fear that not only was another individual present in the house but that she was armed. As in *Buie*, moreover, Perkins has not shown that securing the basement was an unreasonable act on the part of the officers—either because it was not near the kitchen (where the guns were found) or because its opening to the upstairs otherwise did not present a risk to the officers. Indeed, Perkins has not presented any evidence regarding the proximity of the basement to the other rooms in the house that would make us question the reasonableness of the search. *Cf. Rodriguez-Suazo*, 346 F.3d at 643 (considering the evidence regarding a search in the light most favorable to the government when examining the denial of a motion to suppress).

Neither *United States v. Akrawi*, 920 F.2d 418 (6th Cir. 1990), nor *United States v. Hatcher*, 680 F.2d 438 (6th Cir. 1982), undermine this conclusion. In *Akrawi*, it is true, the court invalidated a protective sweep. But in that case, the officers—after arresting the subject of the arrest warrant and detaining others found immediately upon entry—remained in the residence an additional forty-five minutes and eventually searched rooms on the second floor. *Akrawi*, 920 F.2d at 420. The officers in *Akrawi* "articulated no specific basis for believing that the second floor of the . . . residence harbored any individual posing a threat to the agents" and failed to present any justification for the length of their stay. *Id*. Here, in contrast, the officers had a legitimate reason for believing another person was in the house, and Perkins has not argued that the officers stayed in the house for an unjustifiably long period of time.

*Hatcher* likewise invalidated a protective search but is likewise beside the salient point here. After arresting Hatcher, a suspected drug dealer, authorities conducted a search of his entire house, including several rooms in the basement. *Hatcher*, 680 F.2d at 442. The district court found that "there was no evidence that Hatcher was a dangerous individual and no indication that any other persons were in the house at the time of Hatcher's arrest," *id.* at 444, but nonetheless concluded that the search was valid because "the subject of drugs is a dangerous one, dangerous for all of those persons involved in it, especially those on the law enforcement side." *Id.* (quoting district court opinion). In reversing the district court's decision, the court made the point that officers may not justify a protective sweep solely on the ground that the arrested individual was suspected of drug dealing. In contrast to *Hatcher*, the officers here had more than a generalized suspicion of the risks associated with narcotics investigations; they had a legitimate reason for believing another individual (and an armed individual at that) was in the house—which, since *Buie*, has always been a sufficient reason for a protective sweep.

III.

For these reasons, we affirm the district court's denial of Perkins' motion to suppress.