OPINION
{¶ 1} Defendant-appellant Burlie C. Quartman appeals from his conviction and sentence, following a no-contest plea, to one count of Having a Weapon While Under a Disability and one count of Receiving Stolen Property. Quartman contends that the trial court erred when it denied his motion to suppress evidence found, in plain view, during a protective sweep of his residence following his arrest, on an unrelated charge. The State contends that the protective sweep of Quartman's residence was permitted both on the ground that Quartman consented to it, and on the ground that there were exigent circumstances justifying the sweep.
 {¶ 2} Although we conclude that the evidence falls somewhat short of establishing that Quartman consented to the search, we agree with the State that there is evidence in the record to support the trial court's conclusion that there were exigent circumstances justifying the protective sweep of the residence, during which a shotgun and a crack pipe were found in plain view. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} One evening, at about 10:00 p.m., in April, 2005, Dayton Police Officer Christopher Smith was dispatched to Quartman's residence, at 425 Brooklyn Avenue, in Dayton, to execute a warrant for Quartman's arrest on a charge of discharging a firearm into a residence. Smith was told to use caution. He knew that Quartman had made a complaint of criminal damaging at that address two weeks earlier, claiming that his Cadillac had been "shot up," and he also knew of an incident in 2002, when two police officers had been dispatched to the residence, and a shot was fired from inside the residence out the front door.
 {¶ 4} After the officers knocked and announced themselves at the front door, Smith could hear conversations at the back of the house, and he also heard people running toward the back of the house. Fifteen to thirty minutes after the initial knock-and-announce, another police officer informed Smith that he had seen Quartman "inside the kitchen hunched down, walking around the back kitchen area." At one point, Smith could hear at least three people conversing in a bathroom.
 {¶ 5} About an hour after the initial knock-and-announce, Smith, who had repeatedly called the residence on a cell phone, and left approximately fifteen messages on Quartman's answering machine urging Quartman to respond, finally had the opportunity to talk to Quartman on the phone. After Smith explained his purpose, and expressed a wish to accomplish Quartman's arrest peacefully, Quartman said he would come out after turning some lights off and changing his clothes.
 {¶ 6} Ten minutes later, Quartman not having emerged from the residence, Smith called Quartman again. Again, Quartman said he would come out. Finally, at 11:30, about an hour and a half after the initial knock-and-announce, Quartman came out of the residence. He was handcuffed and positioned standing next to a police cruiser. The door locked behind Quartman, and he was the only person to emerge from the residence. By this time, a SWAT team had been assembled, and the only entrances to the house were covered, so Smith knew that the other occupants of the house were still inside. Smith testified as follows as to what next occurred:
 {¶ 7} "So I went over to Burlie and advised him I knew there was somebody else in the house. He told me his son was still in there. So I asked Burlie if he had keys to the front door. He said yes. I asked him if we could open the front door. He said yes. `But,' he said, `I want to call my son inside the residence and ask him to step out.'
 {¶ 8} "So at that point Burlie's in handcuffs. However, we did place a cell phone against his ear. We dialed the number, and he called his — I believe his son, Junior Quartman, whom then come [sic] to the front door and walked out as well as two other individuals.
 {¶ 9} "Q. Once the two individuals and his son are out of the house, what do you or the other officers decide to do?
 {¶ 10} "A. At that point, Lieutenant Chabali [who was in tactical command] requested that the house be checked for anybody else. Therefore, SWAT personnel did enter the house to make sure there was nobody else inside.
 {¶ 11} "Q. So the SWAT personnel wasn't serving a warrant.
 {¶ 12} "A. Correct.
 {¶ 13} "Q. They were clearing the house. Or what do you call that?
 {¶ 14} "A. Basically clearing the house, making sure there's no other persons inside the house.
 {¶ 15} "Q. What if anything unusual do you learn when SWAT personnel are clearing the house?
 {¶ 16} "A. Once they finished clearing the house, Officer John Zimmerman calls me on the radio, asked me to come upstairs. I went upstairs to an east bedroom, and he points out a Winchester 12-gauge shotgun in plain view laying on top of a dresser. He also points out a two-and-a-half-inch-long glass crack pipe that is laying on the couch — I'm sorry — bed of that bedroom.
 {¶ 17} "Q. Did he indicate to you that it was — stored in that fashion when he first saw it?
 {¶ 18} "A. Yes."
 {¶ 19} Quartman was charged by indictment with one count of Having a Weapon While Under a Disability, and one count of Receiving Stolen Property, it having been determined that the shotgun was stolen. He moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure.
 {¶ 20} Following a hearing on the motion, Quartman's motion to suppress was denied. Thereafter, he pled no contest to the charges, was found guilty, and was sentenced accordingly. From his conviction and sentence, Quartman appeals.
 II {¶ 21} Quartman's assignments of error are as follows:
 {¶ 22} "THE TRIAL COURT'S FINDINGS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 23} "THE TRIAL COURT FAILED TO APPLY THE CORRECT LAW TO ITS FINDINGS OF FACT."
 {¶ 24} Both assignments of error are addressed to the suppression proceedings. Essentially, Quartman is contending that the trial court's decision to deny his motion to suppress is both against the manifest weight of the evidence and contrary to law.
 {¶ 25} In that part of the trial court's written decision addressed to the search and seizure issue, the trial court reasoned as follows:
 {¶ 26} "Regarding Branches land II of the motion, the State has the burden to show an exception to the search warrant requirement of the Fourth Amendment. The State advances two (2) grounds constitutionally authorizing a warrantless entry into Defendant's residence.
 {¶ 27} "First, the State argues that Defendant gave verbal consent for the police to enter his residence. Defendant argues there was no consent. Based on this record, the Court finds that Defendant gave consent for the police to enter his residence (Transcript pg. 22). The Defendant, after his arrest outside of the residence, told Officer Smith that the police could open the front door of the locked residence with keys provided by Defendant conditioned upon Defendant's son's prior vacation of the premises. The Court infers consent based upon Defendant's statements and actions.
 {¶ 28} "Second, the State argues that there were exigent circumstances present that authorized entry into Defendant's residence. Defendant argues that the exigency of the situation did not rise to a level permitting the police to enter without a search warrant given the fact that Defendant had exited the house and submitted to his arrest outside of the house.
 {¶ 29} "Upon duly considering the matter, the Court finds exigent circumstances have been established by the State authorizing entry into the house to check for the presence of other persons and to safeguard police on the scene. The evidence supporting this finding is: (1) On the showing of probable cause demonstrated by the complaint (State's Exhibit 1B), a judge of the Dayton Municipal Court issued an arrest warrant for Defendant for shooting into a habitation, a violent felony involving a firearm. The police could reasonably believe that the Defendant was a violent person and possessed a firearm. (2) Even though Defendant's son and two others exited the house before police went in, the police knew multiple persons were in the house and had no way to know if everyone had vacated. (3) Police knew of a prior SWAT callout to this residence in 2002 on a family trouble call involving Defendant's girlfriend or wife where a shot had been fired from inside the residence to the outside thereof. (4) Two weeks prior to the date of the subject incident, police had been called out to this residence by Defendant on a criminal damaging call where Defendant's car had been shot up.
 {¶ 30} "Based on the foregoing, the Court finds that the police not only had constitutional authority but had a duty to `sweep' the residence for the limited reason to assure the safety of others as well as themselves. The `sweep' conducted by SWAT officers was not pretextural to conduct a general search thereof. See State v. Kaser
(Nov. 3, 1989), Montgomery App. No. 11373, 1989 Ohio App. Lexis 4114.
 {¶ 31} "Once lawfully in the residence, the police found in plain view the gun in question. Its seizure was permitted based on the discussion above. Upon checking the serial numbers, the gun was determined to have been stolen.
 {¶ 32} "Accordingly Branches I and II of Defendant's motion are also OVERRULED."
 {¶ 33} With the notable exception of the trial court's finding that Quartman consented to the protective sweep of his residence, we conclude that there is evidence in the record to support all of the findings of the trial court quoted above, and that those findings are not against the manifest weight of the evidence.
 {¶ 34} It is the duty of the State to establish that Quartman consented to the search. Although the issue is close, we conclude that the evidence in this record falls short of establishing that Quartman consented to the protective sweep. It may be that he did, but the evidence in this record does not establish that he did; it merely establishes that he consented to the opening of his front door. We do not agree that it is reasonable to infer, from Quartman's consent that his front door might be opened, that he consented to the protective sweep of his residence. Quartman may have concluded, especially in view of what had transpired in 2002, where police were summoned to the residence and a shot was fired through the door from the inside to the outside, that the police were merely attempting to assure themselves that no one was stationed just inside the door, armed and with hostile intent.
 {¶ 35} With respect to the issue of exigent circumstances, we agree with the trial court that the evidence in the record, which it cited, supports a finding of exigent circumstances, justifying a protective sweep of the house. Although Smith testified that it was his understanding, "based on what Mr. Quartman is telling me," that the only occupants of the residence had exited, and that it was then vacant, the police could reasonably distrust the information they received from Quartman. Quartman had not been especially cooperative with the police, given that it took an hour before he deigned to communicate with them.
 {¶ 36} Given the fact that Quartman was charged with a violent act involving a firearm, for which a magistrate had found probable cause, his reluctance to even talk to the police who came to arrest him, and the 2002 incident in which police officers came to his residence and a shot was fired from the inside of the house through the door, we conclude that the police had sufficient grounds to be concerned that one or more individuals might remain inside the house, armed, and with hostile intent. This justified a protective sweep of the house.Maryland v. Buie (1990), 494 U.S. 325, 110 S.Ct. 1093.
 {¶ 37} Quartman's assignments of error are overruled.
 III {¶ 38} Both of Quartman's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN, J., concurs. GRADY, J., concurring.