[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10113
Non-Argument Calendar
_____

D.C. Docket No. 2:18-cr-00015-MHT-GMB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ADRIAN SOLANO-MENDOZA,
a.k.a. Henry Selva-Sauzo,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(October 7, 2019)

Before ED CARNES, Chief Judge, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

Adrian Solano-Mendoza pleaded guilty to unlawful reentry into the United States by a previously deported alien and possession of a firearm by an alien. He appeals the district court's denial of his motion to suppress evidence of a firearm that officers discovered during a protective sweep of his home conducted after his arrest on the front porch.

I.

On January 8, 2018, eight Immigration and Customs Enforcement officers and a Chilton County Sheriff's Office deputy came to Solano-Mendoza's home in the early morning to serve a warrant for his arrest for unlawful reentry into the United States after deportation. As they approached the home they saw Solano-Mendoza's truck and another car parked outside. The officers knew from Solano-Mendoza's criminal history that he had possessed firearms in the past. The plan had been for the officers to set up a perimeter, knock on the door and announce their presence, break down the door, and take Solano-Mendoza into custody. But as they drove up to Solano-Mendoza's home he came out onto the front porch. Agent Scott Skillern recognized Solano-Mendoza and ordered him onto his knees.

As the agents handcuffed Solano-Mendoza and led him to a police vehicle his wife, Paula Munoz, and two daughters, Jasmin and Alejandra, lined up at the front door and watched the arrest. They began to open the door and come out onto the porch, but complied when agents told them to stay inside. As Solano-Mendoza

was being led to a police vehicle Skillern talked to the two daughters, who unlike Munoz were fluent in English. The daughters asked Skillern what was happening and he asked them if the officers could come inside and explain. They said yes.

Skillern entered the living room through the front door and asked thirteen-year-old Jasmin if the officers "could make a quick search" to make sure nobody else was in the house. Jasmin said "sure." Officer Chris Purdy then entered Solano-Mendoza's bedroom and discovered an assault rifle in plain view on the floor of the bedroom's closet. He returned to the living room to inform his fellow officers that he had found a weapon and to ask them if they needed help sweeping the rest of the house. Purdy testified that his discovery of the assault rifle and return to the living room occurred in the first 90 seconds after he entered the home. The officers continued their search and discovered a hunting rifle under the bed in the master bedroom. They also discovered certain legal documents belonging to Solano-Mendoza, although the record does not indicate precisely where or when those documents were discovered.

Munoz testified that after the officers entered her home she was directed to sit in the living room, where she could hear officers searching through drawers in the master bedroom and see them going through cabinets in the kitchen. An officer asked her to come with him to the master bathroom. Her daughters stayed in the

3

living room where two officers remained stationed inside the front door of the home.

There were three officers in the bathroom, including officer Michal Kocian who translated for Munoz. Munoz testified that the officers asked her to sit on the edge of the bathtub and presented her with documents belonging to her husband that related to his criminal record. Kocian advised Munoz in Spanish of her Miranda rights, but did not advise her of her right to refuse consent to a search of her home. Kocian then asked her several questions about her identity and immigration status.

Kocian testified that he asked Munoz for consent to search the master bedroom and bathroom and she agreed. He also asked if there were any other weapons in the home and Munoz said that there was a handgun in the nightstand next to the bed. Munoz testified that nobody ever asked her for consent to search her home and she believed that she had to let the officers search. She testified that although the officers were polite, she believed that they were planning to arrest her too. She said that she was shaking with tremors and dizzy due to her diabetes. After completing their search the officers took Munoz's Mexican passport and told her to report to the ICE office in Birmingham one hour later.

In February 2018 a grand jury charged Solano-Mendoza of unlawful reentry into the United States by a previously deported alien, in violation of 8 U.S.C.

4

§ 1326(a), (b)(2); possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1); and possession of a firearm by an alien, in violation of 18 U.S.C. § 922(g)(5). A few months later he filed a motion to suppress evidence of the firearms and documents that were discovered during the search of his home.

The district court adopted the magistrate judge's Report and Recommendation denying the motion as to the assault rifle discovered in Solano-Mendoza's closet and granting the motion as to the other firearms and documents discovered during the search. The report found that the officers were justified in making an initial protective sweep of the home and that the assault rifle was discovered during that protective sweep. But it found that the remaining evidence, which was found later on, was discovered during an illegal search because the officers did not obtain valid consent from either Jasmin or Munoz.

Solano-Mendoza pleaded guilty to illegal reentry and possession of a firearm by an alien in exchange for the government dismissing his remaining charge for possession of a firearm by a felon. The plea deal also allowed him to appeal the issues raised in his motion to suppress. He was sentenced to 18 months imprisonment followed by three years of supervised release. He now appeals, contending that the district court erred in failing to suppress evidence of the assault rifle.

II.

When reviewing a ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Newsome, 475 F.3d 1221, 1223 (11th Cir. 2007). We construe facts in the light most favorable to the party that prevailed below, here the government. Id. at 1224.

A warrantless search inside a home is, with few exceptions, unreasonable under the Fourth Amendment. Kyllo v. United States, 533 U.S. 27, 31 (2001). One of those rare exceptions is a properly limited warrantless "protective sweep" conducted incident to an arrest, which is reasonable under the Fourth Amendment "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 337 (1990).

A protective sweep should last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335–36. Protective sweeps are necessary to protect officers' safety during an in-home arrest because "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Id. at 333. We have held that such a protective sweep of a home can be made incident to an arrest on the front porch where

6

officers have a reasonable belief that there are firearms and potentially dangerous individuals inside the home.  See United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983)

Here the district court did not err in concluding that the officers were engaged in a valid protective sweep of Solano-Mendoza's home when they found the assault rifle in his closet.  The officers knew from Solano-Mendoza's criminal history that he had possessed firearms in the past.  And they knew from the two vehicles parked in front of the home and from his wife's and daughters' presence at the front door that there were others inside.  These details provide specific, articulable facts under which officers could reasonably justify a limited sweep to secure their safety.  See id. (upholding the constitutionality of a protective sweep made incident to an arrest on the front porch where officers had observed the defendant and another individual unloading illegal guns into the home just before the arrest).  And while Solano-Mendoza was already in custody when the officers conducted the protective sweep, the officers were in an unfamiliar setting and it is uncertain whether they could have finished the arrest and left the scene quickly enough to obviate their security concerns about potentially dangerous individuals inside the house.

The initial sweep was also limited to areas inside the house that might have "harbor[ed] an individual posing a danger to those on the arrest scene."  Buie, 494

U.S. at 337.   Purdy discovered the assault rifle in plain view within approximately 90 seconds of entering the home while checking to see if anyone was hiding in the bedroom closet.  Munoz did testify that she saw officers searching through cabinets in the kitchen and heard them opening drawers in her bedroom, which exceeds the scope of a protective sweep.  But construing the facts in the light most favorable to the government, the record does not support the conclusion that this occurred during the initial sweep.  See Newsome, 475 F.3d at 1224.  As the magistrate judge noted in his report, Munoz "was not pressed on the precise timeline for these events" and it is "unlikely that, if the officers did begin to look through the drawers, it happened within the first 90 seconds."

**AFFIRMED**.