[Cite as *State v. Fitch*, 2024-Ohio-1295.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-28 |
| | : | |
| v. | : | Trial Court Case No. 23 CR 147 |
| | : | |
| LARRY C. FITCH, JR. | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 5, 2024

. . . . . . . . . . .

DUSTIN M. DAVIS, Attorney for Appellant

MATTHEW C. JOSEPH, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Larry C. Fitch, Jr., appeals from his conviction, following his no contest plea, of one count of aggravated possession of drugs. Specifically, Fitch challenges the trial court's decision overruling his motion to suppress. For the reasons discussed in this opinion, the judgment of the trial court will be affirmed.

**Facts and Procedural History**

{¶ 2} On November 10, 2022, Officers Chad Chalfant and Lucas Schlumpf of the Troy Police Department were investigating a prior pursuit of a suspect in a Pontiac; Chalfant had received information that Fitch sold the Pontiac to the suspect and that Fitch was "staying" at the residence at 719 Canal Street. Schlumpf had seen Fitch park his truck in front of the residence and enter it through a door on the left side of the house.

{¶ 3} The officers interacted with the property owner, Ronald Minnich, and his son Michael, when they sought entrance to the house at 719 Canal Street. They asked if Fitch was there. Minnich answered affirmatively and gave the officers permission to go upstairs and speak with Fitch.

{¶ 4} According to the officers, they proceeded to the upstairs of the home to an area that looked like an attic with rooms. They encountered a woman who ran away from them into an area enclosed by a tarp, which she pulled closed behind her when she entered it. At this point, the officers concluded that a protective sweep of the area was warranted for officer safety. In the course of the protective sweep or immediately thereafter, they observed a large bag of methamphetamine next to Fitch.

{¶ 5} On May 8, 2023, Fitch was indicted on one count of aggravated possession of drugs. He filed a motion to suppress and, after a hearing, the court overruled the motion. Fitch then pled no contest to the charge, was found guilty, and was sentenced to a mandatory indefinite term of two to three years in prison.

### Assignments of Error and Analysis

{¶ 6} Fitch asserts two assignments of error, which we will consider together. First, he argues that the trial court erred in ruling that the address on Canal Street was a single-

family dwelling; second, he contends that Minnich could not have authorized a "search" of the part of the premises in which Fitch was found. Fitch concludes that the drugs found by the officers should have been suppressed.

{¶ 7} Fitch asserts that he was a tenant and that the officers failed to ask Minnich about Fitch's status. Fitch argues that the upstairs area entered by officers was "clearly a private bedroom," secured by "a tarp over the door providing for privacy in the sleeping area." According to Fitch, there was no evidence that Minnich shared any of the upstairs space with him or that the area was a common area and, as such, Minnich lacked authority to consent to the search of the upstairs of the house. Fitch also asserts that the trial court misstated facts related to the Auditor's record for the property.

{¶ 8} In response, the State points out that the trial court specifically found the testimony of Fitch and his girlfriend was not credible. According to the State, the officers reasonably relied upon Minnich's authority, and Fitch's argument that the trial court was mistaken in this conclusion is without merit.

{¶ 9} The evidence presented at the suppression hearing was as follows.

{¶ 10} The police officers were looking for Fitch in their investigation of an unrelated incident. They had heard that Fitch was staying at 719 Canal Street, and Officer Schlumpf saw Fitch's truck parked outside while on routine patrol. Schlumpf had also seen Fitch enter the residence.

{¶ 11} Officer Chalfant testified that he was familiar with the Canal Street address, having been there multiple times for different disturbances and mental health concerns, squatters, and people with warrants and weapons. Chalfant testified that Ronald Minnich

owned the residence. According to Chalfant, the officers asked Minnich if Fitch "was staying at the residence or if he was there"; Minnich responded that Finch was upstairs and gave the officers permission to enter the home and go upstairs to speak to Fitch. Chalfant described entering through a living room area "about ten steps" to a little door which led to the stairs. Chalfant and Schlumpf proceeded up the stairs. Chalfant described the upstairs as "a little attic area with some rooms." Chalfant had had prior interactions with Fitch and believed that he resided on Cloverleaf Drive at the time. There was no indication to Chalfant that the Canal Street address contained more than one residential unit.

{¶ 12} Similarly, Officer Schlumpf testified that he had been to the house multiple times for firearms complaints, warrants, and drugs. He testified that he and Officer Chalfant obtained Minnich's permission to go upstairs to talk with Fitch. They did so by crossing through the living room, going through a door, and going up steps. Video from Schlupmf's body camera was presented depicting this path. Schlumpf further testified that, when they turned at the top of the steps, the officers saw a woman (later identified as Fitch's girlfriend, Joy) who "took off running" down the hallway and pulled a tarp across a doorway. Schlumpf testified that he did not know who the woman was or what she was doing and, at that point, he thought a protective sweep was warranted. When the officers pulled back the tarp, the woman was sitting next the Fitch in the room. Chalfant entered the room, Schlumpf saw Fitch put something behind his back, and then Chalfant observed a large bag of a substance that was later determined to be methamphetamine.

{¶ 13} With respect to the condition of the premises, Chalfant acknowledged on

cross-examination that there were two external doors on the front of the building, with the "front door" on the left side. The officers entered through the left door, and Schlumpf testified that Fitch had also entered through the left door. Neither officer was aware of a separate residence at that address or of an address of 719½ Canal Street. Both officers testified that they passed through an "interior door" from the living room to get to the stairs to the upper level, and Schlumpf stated that this door had been ajar when they arrived. Chalfant did not notice if there was a kitchen or bathroom upstairs or if there was exterior siding on the interior stairwell wall, but Schlumpf acknowledged that his body camera video depicted exterior siding on that wall. Chalfant testified that Fitch had not given the officers permission to enter any part of the residence.

{¶ 14} According to Schlumpf, the house was dilapidated with trash everywhere and damage from a recent fire; he described the upstairs as "charred with plywood around the windows." Schlumpf did not believe that the upstairs "was habitable by any means," and he testified that he had no reason to think anyone lived there.

{¶ 15} Fitch and his girlfriend, Joy, testified for the defense. Joy testified that she was Fitch's girlfriend and that, on November 10, 2022, she was living with him at 719½ Canal Street, which she described as an upstairs apartment they rented from Minnich. She testified that they entered the apartment through the door on the right side of the property. Joy specifically stated that she and Fitch had entered through the door on the right side of the house around 7:30 p.m. on the day Officers Chalfant and Schlumpf came to the home. According to Joy, that door led to steps to the upstairs, and then there was another door to their apartment at the top of the steps. She testified that there was a

bathroom upstairs and there was "supposed to be" a kitchen, but it was torn apart and Fitch was remodeling it.

{¶ 16} Fitch testified that he resided at 719½ Canal Street on November 10, 2022. He arrived home that evening around 7:30 p.m. and entered through his entry door, the brown door on the right side of the house. According to Fitch, that door led directly to the upstairs apartment, with a door at the top, and there were a living room, kitchen, and bathroom in the apartment. Fitch stated that he had an oral agreement with Minnich that he would live there while he (Fitch) remodeled the apartment, and Fitch would start paying rent when the remodeling was complete; the remodeling had begun in October 2002. Fitch testified that those living downstairs were not supposed to have free access to the apartment. He also asserted that the property was "listed as a duplex in the City of Troy."

{¶ 17} The trial court denied Fitch's motion to suppress. The court concluded that Minnich had had authority to consent to the officers' search of the upstairs and that, even if Minnich arguably had not had authority to consent, the officers had reasonably relied in good faith upon his apparent authority.

{¶ 18} The court found that several factors supported its decision. The court found that the officers' credibility was "without question" and was corroborated by the body camera footage. The court also noted the officers' familiarity with the Canal Street address and its residents, including Minnich and his children, who they knew by name; they did not know of an address of 719½ Canal Street. When the officers asked Minnich's son, Mike, if Fitch was present, Mike responded that Fitch was not "down here" but that he was "probably upstairs," without suggesting that Fitch was in an area of the home

solely under Fitch's control. None of the Minniches stated that Fitch was renting the upstairs property, and neither officer had been aware that Fitch was living at the Canal Street address. Chalfant believed he lived somewhere else, and Schlumpf testified that Fitch was listed as "at large" in the Troy Police database.

{¶ 19} With respect to the body camera video, the trial court observed that the video showed that there was access from the downstairs living room to the upstairs and that, when Fitch and Joy "separately exited the second floor, neither attempted to go out the door [on the right of the house] they described as the entry door"; rather, they had automatically turned at the bottom of the staircase through "the same interior door the officers had been led through." The court also observed that neither Fitch nor Joy had knocked or announced their presence before entering the lower-level living room "to indicate they were entering a residence separate and apart from" their own residence on the second floor. Joy also was instructed by Fitch to use a downstairs bathroom.

{¶ 20} The court credited Officer Schlumpf's testimony that Fitch had entered the home through the door on the left side of the home. The trial court considered the "overall appearance of the home in the videos," which included a lot of "stuff" throughout in the downstairs areas with only narrow pathways to move through the home. The court noted that another individual in the home was arrested on an active warrant downstairs in the course of the encounter. The court found Fitch's and Joy's testimony that they had entered the right-side door lacking in credibility and found no evidence of a residence address at 719½ Canal Street, even considering the Auditor's information that Fitch introduced.

{¶ 21} The trial court found that the totality of the circumstances demonstrated there was no basis to believe Fitch had a separate living quarters within the residence where he would have been entitled to an expectation of privacy, necessitating Fitch's consent to enter or a warrant. The trial court concluded that Fitch was not the owner of the property and, based on the video footage in which people moved freely between the first and second floor, it was unpersuaded that Fitch was in control of the upstairs area The court found that the "historical use of the property weigh[ed] against [Fitch] and favor[ed] Minnich" in his ability to consent to the warrantless entry. The court found that the State proved "by clear and convincing evidence that Robert Minnich had common authority to consent to the officers' search of the upstairs of the dwelling or, in the alternative that the officers reasonably relied in good faith on his apparent authority."

{¶ 22} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. At a suppression hearing, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). " 'Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *State v. Brown,* 2016-Ohio-4973, 67 N.E.3d 1278 ¶ 7 (2d Dist.), quoting *Burnside.* "The application of the law to the

trial court's findings of fact is subject to a de novo standard of review." *Id.*

{¶ 23} Although the trial court framed the issue as to whether Ronald Minnich had the authority to consent to the search of the residence, we believe the proper analysis lies in whether Minnich had authority to consent to the entry of the officers into the residence and whether, after entering the upstairs and observing the tarp being pulled closed across a doorway, the officers possessed articulable facts to conduct a protective sweep of the area. We answer both questions affirmatively.

{¶ 24} "[A] police officer may reasonably rely upon the apparent authority of the occupant of [a] premises to consent to the officer entering upon those premises, in the absence of any indication that the occupant lacks that authority." *State v. Harris*, 2d Dist. Montgomery No. 19479, 2003-Ohio-2519, ¶ 22. "Where the police officer reasonably relies upon consent given by an occupant of the premises to enter upon the premises, entry upon the premises does not violate the Fourth Amendment's prohibition against unreasonable searches and seizures." (Citation omitted). *Id.*; s*ee also State v. Kilgore*, 2d Dist. Montgomery No. 18093, 2000 WL 299546, *4 (Mar. 24, 2000) (finding "nothing inappropriate about the police's entering an apartment after hearing a voice say 'come in,' especially where the officers immediately identified themselves as police officers and did not try to trick, threaten, or force their way into the residence.").

{¶ 25} Further, "[a] protective sweep is a reasonable exception to the Fourth Amendment's warrant requirement." *State v. Mathews*, 2d Dist. Montgomery No. 26326, 2015-Ohio-1047, ¶10, citing *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). A protective sweep is permissible when " 'articulable facts * * *, taken

together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the * * * scene.' " *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 36 (2d Dist.), quoting *Buie* at 334. "If contraband is found from this cursory visual inspection, the plain view doctrine would allow the officer to seize it, without a warrant." *Mathews* at ¶ 14.

{¶ 26} Based on the officers' testimony and the body camera video, the trial court concluded that the officers reasonably relied upon Minnich's consent, as the homeowner known to them from previous experience at the home, to enter the residence upon their request to merely speak to Fitch. There was no indication to the officers that Minnich lacked such authority. When the officers initially entered the home, a number of people were present downstairs; in the living area of the home, Minnich, his son, and Minnich's daughter were present with a third man. The entire home was in a state of disrepair and full of various items on the floor and covering all surfaces. The officers walked through a densely cluttered living room and into a narrow kitchen, where another man, who was subsequently arrested on a warrant, was standing. After walking through the kitchen, the officers turned around and went back to the living room. The door from the living room to the upstairs was not locked in a manner suggesting that the doorway was a threshold to a separate residence, and the officers' presence was not announced by anyone as they passed through the door. The officers proceeded up a flight of stairs, which was also crowded with items covering the stairs. At the top of those stairs, a doorway to the left was covered by a tarp; the tarp was pulled closed as the officers

approached by an individual later identified as Fitch's girlfriend, Joy. Officer Schlumpf said, "Don't be pulling that closed," and he pulled the tarp aside and entered the room. Joy, who had apparently closed the tarp, was sitting on an air mattress on the floor. Schlumpf expressed concern for officer safety at that point, based on these circumstances, his familiarity with the address, and prior calls to the residence about weapons and drugs. The officers reasonably conducted a protective sweep based upon this concern.

{¶ 27} Fitch was seated on the mattress next to Joy. From the body camera video, it was clear that Chalfant immediately observed what he believed were drugs in plain view near Fitch, without manipulating or moving anything to observe the drugs.

{¶ 28} Although Fitch presented information from the County Auditor that appeared to list the residence as a two-family dwelling, Ronald Minnich was the only homeowner listed on the record. Even assuming that Fitch and Joy resided there and that their consent was required to enter the room upstairs, looking at the facts that were available to the officers at the time, we agree with the trial court that the officers reasonably believed that they had the homeowner's consent to enter the residence, and they advised Fitch of this on the video. The record is clear that the officers did not request, and Minnich did not authorize, a search of the upstairs; Minnich allowed them to enter to speak to Fitch. The facts available to the officers, together with the reasonable inferences from those facts, warranted the officers' conclusion that a protective sweep was needed to protect them. The officers were familiar with the address, having made arrests there and responded to disturbances and other issues at the residence in the past.

The officers observed an individual who pulled a tarp across a doorway immediately upon seeing them, blocking their view of the area and any persons behind it. This supported the officers' belief that a protective search was warranted. Immediately upon opening the tarp, the officers observed the drugs.

{¶ 29} The video made clear that Officer Chalfant believed Fitch lived elsewhere, and Fitch acknowledged having lived at a prior address. Additionally, Officer Schlumpf's description of the upstairs area as uninhabitable was supported by the evidence. The room with the air mattress was not finished with drywall and appeared to be an attic under some type of construction. No personal belongings of Fitch and Joy, such as a dresser or clothing, were visible. The video depicted a refrigerator that appeared to be taped shut and an unfinished bathroom.

{¶ 30} In sum, the police officers involved in Fitch's arrest obtained the consent of the homeowner to enter the home and proceed upstairs to speak to Fitch; methamphetamine was then found in plain view in an area of the home that appeared to be uninhabitable. While Fitch claimed the area was his residence, the police relied in good faith on Minnich's consent to enter, and the surrounding circumstances were not such to cause the officers to doubt Minnich's authority. A protective sweep of the area for officer safety was further warranted. For these reasons, Fitch's assignments of error are overruled.

{¶ 31} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.