[Cite as *State v. Fields*, 2026-Ohio-867.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DAJUAN D. FIELDS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case Nos. 25 BE 0038, 25 BE 0042

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 24 CR 236

**BEFORE:**
Mark A. Hanni, Carol Ann Robb, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan*, Belmont County Prosecutor, and *Atty. Jacob A. Manning*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Edward F. Borkowski, Jr.*, for Defendant-Appellant.

Dated: March 13, 2026

**HANNI, J.**

{¶1} Defendant-Appellant, DaJuan D. Fields, appeals a Belmont County Common Pleas Court judgment sentencing him to 24 to 29.5 years in prison. Appellant entered a no contest plea to first-degree felony drug possession with a major drug offender specification (MDO) and a guilty plea to second-degree felonious assault with a repeat violent offender specification (RVO). Appellant's counsel and Appellant pro se filed notices of appeal, which we consolidated into 25 BE 0038.

{¶2} Appellant asserts the trial court erred by denying his motion to suppress evidence found by law enforcement as they executed a search warrant at Appellant's house to locate and arrest him on the basis of an active arrest warrant. He contends police immediately located and placed him into custody on the main floor of his home, yet continued to search the home, even venturing upstairs and forcing open locked doors. Appellant further asserts that the trial court erred by sentencing him to 8 years in prison for felonious assault when the parties agreed to a recommended two-year sentence. He contends his guilty plea was unknowingly made because the trial court failed to offer him a chance to withdraw the plea after imposing this sentence.

{¶3} For the following reasons, we affirm the trial court's denial of the motion to suppress. While the trial court erroneously concluded that Officer Kubat's room sweep on the main floor was not a protective sweep, we affirm its decision denying the motion to suppress because a protective sweep of the main floor and upstairs was justified. Law enforcement officers were executing a high-risk search warrant of Appellant's home to locate him and effectuate his arrest on the basis of an arrest warrant for a serious felonious assault. They knew Appellant's violent criminal history, he was identified in an active drug investigation, and he had an active arrest warrant for felonious assault that caused serious bodily harm and involved other participants and possibly firearms. Officers also observed a juvenile run from the house immediately prior to execution of the warrant, and other individuals were found in the house.

{¶4} After breaching the front door of Appellant's home, officers split to the left and right of the stairway to locate Appellant. While officers arrested Appellant in the living

room, Officer Kubat advanced to an opposite room and encountered four individuals. He also observed a baggie of illegal drugs lying in plain view on the floor. Officer Kubat performed a justified protective sweep of this room because he knew Appellant's criminal history, knew the arrest warrant issued for Appellant involved a violent felonious assault with other individuals who may have firearms, and he observed a juvenile run from Appellant's house before law enforcement entered the home to execute the warrant. Officer Kubat also believed he saw movement in this room upon breaching the front door.

{¶5} In addition, officers were justified in conducting a protective sweep of the upstairs of the home, which recovered a large bag of marijuana lying on a bed. The threat to the safety of the officers persisted even after they had arrested Appellant and conducted a protective sweep of the main floor of the house. Law enforcement had not looked upstairs and individuals could have descended from upstairs to inflict harm. Officers heard people yelling and screaming as Appellant was arrested and heard someone say that a person had run out of the back of the house. Officers had already apprehended a juvenile running from the home, they found and detained others on the main floor, and they knew Appellant had a violent criminal history, was identified in a drug investigation, and had an active arrest warrant for the felonious assault that involved other participants and possibly firearms.

{¶6} Further, the trial court did not abuse its discretion in sentencing Appellant to a longer term of imprisonment than that agreed to by the parties. The trial court was not required to accept the joint recommendation of 2 years and the court warned Appellant three separate times during his plea hearing that it was not bound by the recommendation. The trial court also ordered a presentence investigation report and did not immediately proceed to sentencing. The court explained its reasons for the sentencing, noting Appellant's criminal history, his prior unamenability to supervision, and his repeated commission of crimes, including violent crimes.

{¶7} On November 7, 2024, the Belmont County Grand Jury indicted Appellant on two counts of felony-one drug possession with MDO specifications, two felony-one drug trafficking with MDO specifications, one felony-three having weapons while under disability, and a second-degree felony felonious assault with a RVO specification. Appellant was arraigned and pled not guilty.

**{¶8}** On December 5, 2024, the Belmont County Grand Jury issued an 11-count superseding indictment charging Appellant with: 5 felony drug possession charges with one MDO specification; 4 felony drug trafficking offenses with one MDO specification and three specifications of trafficking in the vicinity of a juvenile; a second-degree felonious assault with a RVO specification; and a felony having weapons while under disability charge. The drug offenses involved fentanyl or a fentanyl-related compound, as well as methamphetamine. Appellant was arraigned and pled not guilty.

**{¶9}** On December 2, 2024, Appellant filed an amended motion to suppress. He asserted law enforcement executed an arrest warrant allowing them to enter his home in Barnesville, Ohio to search for and arrest him. He contended that although officers immediately located and secured him and others on the main floor of his home, they continued to search the remainder of his house, including its upstairs, which well exceeded the scope of their warrant.

**{¶10}** The trial court held a suppression hearing on February 14, 2025. Defense counsel framed the issue as the following:

Essentially, the first search warrant that was executed was the location of my client's person, and that the officers in the case went beyond that in their initial search, which led them to secure a second search warrant to properly get the things that they had already acquired, in my view.

(Supp. Hg. Tr. 4). The validity of the first search warrant was not challenged and is not challenged on appeal. (Supp. Hg. Tr. 4). Appellant's counsel requested that the court suppress the second warrant and fruit of the poisonous tree seized, including photos, videos, and statements. (Supp. Hg. Tr. 4).

**{¶11}** At the suppression hearing, Detective Dustin Hilderbrand of the Criminal Interdiction Unit of the Belmont County Sheriff's Office testified for the prosecution. He indicated that police received information that Appellant was selling drugs in Belmont County and they conducted a controlled purchase from him in Bellaire, Ohio. (Supp. Hg. Tr. 8). Detective Hilderbrand indicated that a criminal charge was filed and he drafted a warrant for Appellant's arrest at his residence in Barnesville, Ohio. (Supp. Hg. Tr. 9-10). He explained they learned of this residence from the person who had identified Appellant

as involved in an investigation into a felonious assault where the victim was seriously beaten and flown to a hospital.  (Supp. Hg. Tr. 12-13).

{¶12} Detective Hilderbrand testified the sheriff's department enlisted the aid of the Special Operations Branch (SOB) in executing the nighttime arrest warrant, which was essentially a SWAT team.  (Supp. Hg. Tr. 10).  He explained SOB was called because they were executing a high-risk warrant due to Appellant's prior attempted murder and felonious assault offenses, along with the current felonious assault with two other men who were in possession of firearms at that time.  (Supp. Hg. Tr. 11-12).

{¶13} Detective Hilderbrand recalled he was supposed to remain outside of Appellant's house until the house was breached, but a juvenile from inside of the house ran outside and they had to chase him back into the residence.  (Supp. Hg. Tr. 16).  He explained he and members of the SOB team then entered the residence and within 10 seconds, he made contact with Appellant.  (Supp. Hg. Tr. 16-17).  He stayed with Appellant while the SOB completed sweeping the house.  (Supp. Hg. Tr. 17).  He took pictures of the drugs found by officers in the main floor bedroom and upstairs on a bed and he was told they were found in plain view. (Supp. Hg. Tr. 17-19).   He noted that the windows of the house had wooden shutters over the windows.  (Supp. Hg. Tr. 48).

{¶14} Barnesville Police Department Officer and SOB team member Kubat testified for the State.  He participated in the search and was advised that Appellant and others may be present in the house.  (Supp. Hg. Tr. 70-71).  He explained that an officer breached the door and upon entry, he observed individuals located to the left upon entry and he advanced to a room on the right while Chief Arbenz went to the left.  (Supp. Hg. Tr. 71-72).  Upon entry into the room on the right, Officer Kubat observed a male and two children, and a female coming from the bathroom area.  (Supp. Hg. Tr. 72-74).  The lights were on and he noticed a baggie lying on the ground in front of him with what appeared to be narcotics inside.  (Supp. Hg. Tr. 74).  He explained that upon initial entry, the first step of the search, SOB located the person sought for arrest and then a secondary search is conducted for other people in the home.  (Supp. Hg. Tr. 77-78).  He stayed in the room to the right until the secondary search was completed.  (Supp. Hg. Tr. 79).

{¶15} On cross-examination, Officer Kubat testified that even though high-risk warrants could involve danger, SOB teams do not wear body cameras.  (Supp. Hg. Tr.

81-82). He described that upon entry into Appellant's home, he observed stairs in the middle, a room to the left and a hallway on the right leading to a second room. (Supp. Hg. Tr. 85-86). He noted Appellant was apprehended in the room to the left and he encountered four individuals in the room to the right. (Supp. Hg. Tr. 86). Officer Kubat chose to proceed to the right upon entry because Chief Arbenz went to the left and he thought he saw someone move in the room to the right. (Supp. Hg. Tr. 87). He did not notice the baggie of drugs in the room to the right until he had the male lie on the ground because he was focused on the individuals in the room. (Supp. Hg. Tr. 87).

{¶16} Chief Matthew Arbenz of the St. Clairsville Police Department and SOB team leader also testified for the prosecution. He explained that anytime the SOB is called, it usually involves a high-risk situation and they conduct a protective sweep to protect themselves. (Supp. Hg. Tr. 94-95). He recalled that his team commander informed him that an arrest warrant was issued for Appellant and officers requested SOB assistance in executing the warrant at his residence. (Supp. Hg. Tr. 96). He testified he was also advised the reason for the arrest was that Appellant was one of several involved in injuring an individual fighting for his life in the hospital. (Supp. Hg. Tr. 96).

{¶17} Chief Arbenz explained that the SOB does not typically search for evidence of crimes as their job is to search for people. (Supp. Hg. Tr. 99). He indicated that SOB is usually looking only to secure the person who is the subject of the arrest warrant, but they typically secure everyone in the house until they identify who is part of the warrant process. (Supp. Hg. Tr. 100). He recalled that upon gaining entry into Appellant's home, he heard Office Kubat state he had people on the left, so he also went to the left, where they found Appellant, an adult female, and a juvenile male. (Supp. Hg. Tr. 100). He ordered Appellant to get on the ground and held cover while another officer placed him into custody. (Supp. Hg. Tr. 101). He saw Appellant's son crying, so he patted him on the head and said no one was going to get hurt. (Supp. Hg. Tr. 101). He then heard yelling and someone say, "One ran, one ran out the back." (Supp. Hg. Tr. 101). He noted that "[w]e still had an upstairs." (Supp. Hg. Tr. 101).

{¶18} Chief Arbenz continued that once he knew Appellant was detained, he proceeded upstairs with other officers behind him. (Supp. Hg. Tr. 101). He moved down the hallway and entered a bedroom on the right, checked under the bed, and as he stood

up, he saw others flowing through other areas of the upstairs. (Supp. Hg. Tr. 102). He testified he did not find any other individuals, but he observed a large bag on top of the bed that contained a large bag of marijuana inside. (Supp. Hg. Tr. 102). He testified he did not open any doors to get into the bedroom and he did not have to kick, ram, or shoulder any doors to enter. (Supp. Hg. Tr. 103). He also indicated no other SOB member had to force open any door in the house, except for the front door. (Supp. Hg. Tr. 103-104). He affirmed that the photo showed to him by the prosecution reflected the room he entered and no damage to the door frame. (Supp. Hg. Tr. 105).

{¶19} On cross-examination, Chief Arbenz testified he was notified about participating in the SOB job at Appellant's house. (Supp. Hg. Tr. 109). He was informed about the possibility of the presence of firearms, but he did not encounter any in his search for individuals. (Supp. Hg. Tr. 110). He did not read the warrant, but was told they were there to aid with an arrest warrant and to make sure the house was secure. (Supp. Hg. Tr. 110).

{¶20} Chief Arbenz explained that he proceeded upstairs because he saw that the stairs had no SOB members on it and a threat was therefore posed because the area was not cleared. (Supp. Hg. Tr. 114). He indicated that the SOB's job was to look for people that could pose a threat or things that could pose a threat, such as a bomb. (Supp. Hg. Tr. 115). He said the number one threat in securing an area is a human being, but if he saw something else posing a threat, he would let everyone else know about it. (Supp. Hg. Tr. 115-116).

{¶21} On redirect examination, Chief Arbenz testified that a person attempting to flee the scene where the SOB is about to enter signals a potential threat and knowing one of the subjects to the search is a suspect in a serious violent felony offense means a potential for violence against him and his team members. (Supp. Hg. Tr. 117-118). He explained that this would result in the temporary detention of anyone in the home until the officer in charge of the warrant identifies whether that person is the subject of the warrant. (Supp. Hg. Tr. 118). He further testified that if a house has a number of people inside who are unknown and are not the person they are searching for, this signifies that the SOB continues to search. (Supp. Hg. Tr. 118).

{¶22} Defense counsel called Detective Jason Schwarck of the Belmont County Sheriff's Office to testify. He explained that when the SOB is called to assist, they enter the house first and then the Belmont County deputies after the SOB has cleared the residence and performed a secondary clearance. (Supp. Hg. Tr. 130). He stated that when he entered Appellant's residence, he saw a large amount of money in plain view and what appeared to be drugs in a bag on the first floor. (Supp. Hg. Tr. 132). He also testified that he did not personally unlock any bedroom doors upstairs, but he heard someone mention it when he was downstairs. (Supp. Hg. Tr. 134).

{¶23} A body camera video was played to Detective Schwarck and he acknowledged that Detective Grant stated "upstairs locked," on the video and "[t]hey basically busted it open." (Supp. Hg. Tr. 142).

{¶24} On March 17, 2025, the trial court issued its decision denying Appellant's amended motion to suppress. The court made findings of fact. It then held that Officer Kubat entered the bedroom on the right on the main floor at the same time the other officers were securing Appellant in a room to the left on the main floor. The court held that "Kubat's conduct was clearly not a protective sweep but conduct undertaken to arrest the Defendant pursuant to the first search warrant." (3/17/25 Journal Entry). The court continued that Officer Kubat's conduct was lawful "and pursuant to a search warrant for the Defendant's arrest." (3/17/25 Journal Entry). The court found that the illegal drugs Officer Kubat discovered in the bedroom to the right were in plain view and therefore not the product of an illegal search and seizure.

{¶25} The court further found that the marijuana found in the upstairs bedroom would have been found via inevitable discovery from the second search warrant since it was found in plain view upstairs in the bedroom. Nevertheless, the trial court held that the SOB conducted a lawful protective sweep of the entire home based on *Maryland v. Buie*, 494 U.S. 325 (1990), permitting the sweep of areas adjoining the place of arrest. The trial court also found that Appellant presented a high risk of danger to law enforcement safety due to his prior violent convictions and allegations that firearms may be present in the house.

{¶26} On June 30, 2025, the trial court held a hearing and Appellant entered a no contest plea to Count 1 drug possession as to possession of a fentanyl-related

compound, a felony of the first degree, with the MDO specification. He also entered a guilty plea to Count 9 felonious assault, a second-degree felony, with a RVO offender specification. The court journalized the pleas in a thorough entry on July 7, 2025.

{¶27} On July 14, 2025, the court held a sentencing hearing and sentenced Appellant to: 11 years in prison for the Count 1 drug possession conviction; 5 years in prison on the MDO specification, to be served consecutively to the sentence for drug possession; and 8 years in prison for felonious assault, to be served consecutively to the other two sentences. Thus, the court sentenced Appellant to a mandatory minimum term of 24 years in prison, with a maximum term of 29.5 years possible. The court issued its sentencing entry on July 17, 2025.

{¶28} Both Appellant pro se and defense counsel filed a notice of appeal. We issued two separate appellate case numbers, but then consolidated them into 25 BE 0038.

{¶29} In his first assignment of error, Appellant asserts:

THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS.

{¶30} Appellant asserts the trial court erroneously denied his motion to suppress because police lacked justification to conduct a protective sweep of his house beyond the area within his reach. He contends officers placed him in custody on the main floor of his home within 10 seconds of entering and had secured the main floor within 30 seconds. He estimates that in under one minute, he was arrested and others were detained in the house. He asserts no evidence existed showing others were in his house and a further protective sweep was therefore not justified. He quotes Chief Arbenz's hearing testimony that he continued to sweep the house because it was "uncleared," and he had no "specific incident of anything happening that would need to tell me that I need to keep doing my protective sweep." (Supp. Hg. Tr. 121-122). He also quotes Chief Arbenz's additional testimony that he was looking for "anything that could cause physical harm to us or whoever is going to be conducting a search of that house later." (Supp. Tr. 115).

{¶31} Appellant further asserts that even if a protective sweep was justified, law enforcement exceeded the scope of that sweep by searching upstairs and forcing open locked doors. He concedes a sweep may be conducted after an arrest, but only if a

"reasonable possibility" exists that others may be on the property and they pose a danger to law enforcement. He contends no such danger existed in his case. He also contends that officers forced open locked doors in order to find evidence.

**{¶32}** Appellant also maintains the trial court erred by finding the officers' testimony credible because they knew the warrant involved drugs and "it is safe to assume that they were looking for drugs while they were there." (Appellant's Br. 14). He cites Detective Hilderbrand's testimony that he assumed the drugs he took pictures of were in plain view and those discovering the drugs merely alerted him to the presence of the drugs. He also emphasizes Officer Kubat was not wearing a body camera and was alone in the room in which he found drugs merely lying on the floor even though he had secured a male in that room within seconds, but it took him three minutes to find the baggie in plain view and radio the team.

**{¶33}** Appellant also notes the prosecution did not call Officer Schwarck to testify as he stated at the hearing that officers "basically busted it open" when testifying about an officer searching a locked room upstairs. (Supp. Hg. Tr. 142-143). Appellant also cites Officer Schwarck's testimony about finding a large amount of money in the living room where Appellant was arrested, but no one else testified about the money.

**{¶34}** We affirm the trial court's denial of Appellant's motion to suppress. Our review of a trial court's ruling on a motion to suppress "presents a mixed question of law and fact." *State v. Chuppa*, 2025-Ohio-3117, ¶ 14 (11th Dist.), quoting *State v. Burnside*, 2003-Ohio-5372, ¶ 8. In reviewing a ruling on a motion to suppress, we must determine whether competent, credible evidence supports the trial court's findings. *State v. Williams*, 2024-Ohio-943, ¶ 43 (7th Dist.). This standard of review is appropriate as, "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *Id.*, quoting *State v. Venham*, 96 Ohio App.3d 649, 653 (4th Dist. 1994).

**{¶35}** An appellate court accepts the trial court's factual findings and relies upon its ability to assess witness credibility, but we independently determine, without deference to the trial court, whether the trial court applied the appropriate legal standard to the facts. *Williams* at ¶ 43, citing *State v. Rice*, 129 Ohio App.3d 91, 94 (7th Dist. 1998). We will not disturb a trial court's decision on a motion to suppress when supported by substantial

credible evidence. *Id*. Once we determine whether the record supports the trial court's factual findings, we then conduct a de novo review of the trial court's application of the law to those facts. *Chuppa* at ¶ 14, citing *State v. Eggleston*, 2015-Ohio-958, ¶ 18 (11th Dist.) (citations omitted).

**{¶36}** The Fourth Amendment to the United States Constitution and Section 14, Article 1 of the Ohio Constitution guarantee the right to be free from unconstitutional searches and seizures, such as searches performed without a warrant. Evidence is not admissible when it is obtained in violation of the Fourth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 654 (1961). Warrantless searches violate the Fourth Amendment unless they fall within specific, well-established exceptions. *State v. Kessler*, 53 Ohio St.2d 204, 207, (1978), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455 (1971).

**{¶37}** The Fourth Amendment allows law enforcement officers to perform a protective sweep of the premises where an individual is arrested in order to protect officer safety. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id*. Law enforcement may conduct this sweep without probable cause or reasonable suspicion, but it is restricted to a "cursory visual inspection of those places in which a person might be hiding." *Id.* This is because the arrest of a defendant in his home "puts the officer at the disadvantage of being on his adversary's 'turf.'" *Id.* at 333.

**{¶38}** The United States Supreme Court in *Buie* clarifies:

> We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334. The Court emphasized that a protective sweep is only a cursory search of areas where a person may be found and not an entire search of the property. *Id*. at 335.

It further cautioned that the sweep should take no longer than necessary to relieve an officer of this reasonable suspicion of danger and it should be no longer than the time it takes to complete the arrest of the defendant and leave the property. *Id.*

{¶39} Here, Appellant conceded at the suppression hearing that the initial warrant to search his home to locate and arrest him was legitimate. (Supp. Hg. Tr. 4). However, he asserts the protective sweep of his house was not justified because law enforcement immediately found and arrested him on the first floor.

{¶40} The record establishes that Appellant was quickly arrested. While the trial court found that Officer Kubat's "conduct was clearly not a protective sweep," we hold that it was. The *Buie* Court identified two types of protective sweeps. The first is a precautionary, cursory search incident to arrest done to protect officers from threats from others that may be inside the house. *Buie,* 494 U.S. at 327. This sweep does not require reasonable suspicion or probable cause. *Id.*

{¶41} Officer Kubat swept the area adjacent to where Appellant was found to ensure the safety of the officers. He testified that upon SOB breaching the front door, Chief Arbenz proceeded left to the living room while he advanced to a room on the right because he thought he saw movement there. It is reasonable for Officer Kubat to do so as it was unknown if Chief Arbenz had yet identified Appellant as the subject of the arrest warrant in the other room and thus one of the other individuals Officer Kubat encountered could have been Appellant or posed a threat to him and the officers on that floor. Moreover, Officer Kubat and the other officers knew Appellant's violent criminal history, they knew an arrest warrant was issued for him for drug trafficking, and they knew he was a suspect in a felonious assault with two other individuals who had firearms. In addition, Officer Kubat observed a juvenile run out of the house as officers were beginning to execute the search warrant and Officer Kubat thought he observed movement in the room to the right. Even if it Officer Kubat's sweep occurred briefly after Appellant's arrest, *Buie* permits officers to enter rooms at this point when they have not previously been swept for safety measures. *Buie* at 333-334. The drugs he found in this room were in plain view in a baggie lying on the floor. Thus, they were properly seized.

{¶42} Officer Kubat's protective sweep also meets the second type of protective sweep identified in *Buie*, that is*,* one with "articulable facts, which taken together with the

rational inference from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie, 494 U.S. at 334.* Officer Kubat knew the search for and arrest of Appellant was high risk based on Appellant's prior violent convictions and the fact he was suspected in a felonious assault that seriously injured someone and involved other individuals and firearms. Officer Kubat was informed before entry that other people may be found in Appellant's house, as well as illegal drugs. Law enforcement additionally observed a juvenile run from Appellant's house upon their entry into the house. These circumstances constitute reasonable suspicion to warrant a prudent officer in believing that individuals may be present in the home that posed a threat to the safety of the officers at the scene.

{¶43} The protective sweep of the upstairs is also justified by either type of the protective sweep identified in *Buie*. While Appellant had already been apprehended, Officer Kubat located other individuals present on the main floor, and a threat to the safety of law enforcement remained from an unsecured upstairs. Alternatively, articulable facts, taken together with the rational inference from those facts, warranted a reasonably prudent officer in believing that the upstairs harbored individuals posing a danger to those in Appellant's house. Again, law enforcement knew they were executing a high-risk warrant for an individual with a violent history and they knew he was a suspect in the drug trafficking investigation and a felonious assault that seriously injured the victim. They also knew other individuals were suspected in the felonious assault and firearms may have been involved as well. They heard screaming and yelling upon Appellant's arrest and heard someone state that an individual ran out of the house.

{¶44} As to forcing open a locked bedroom door upstairs, the trial court acknowledged uncertainty as to whether officers breached a locked bedroom door in which the bag of marijuana was found. However, the trial court made no further findings or conclusions concerning this issue. Appellant notes the prosecution did not call Detective Schwarck to testify because he stated at the suppression hearing that officers "basically busted it open" when testifying about another officer searching a locked room upstairs. (Supp. Hg. Tr. 142-143).

{¶45} The record indicates Detective Schwarck did not state that officers broke open a locked bedroom door upstairs. Rather, he was played the video from Detective

Hilderbrand's body camera in which a person he identifies as Detective Grant is heard stating, "[y]eah, upstairs locked." (Supp. Hg. Tr. 141-142). He then states, "I think he said, 'they basically busted it open.'" (Supp. Hg. Tr. 142). This is the bedroom in which the bag of marijuana was found.

{¶46} However, Detective Hilderbrand testified that even though Appellant stated he kept a room upstairs locked, none of the officers told him that any door was locked. (Supp. Hg. Tr. 53-54). He further testified that when he went upstairs, he observed the door of the bedroom was open and no signs indicated the door had been breached. (Supp. Hg. Tr. 54-56). He also testified that three doors accessed the bedroom and he was not told which door was locked. (Supp. Hg. Tr. 60-61). He indicated that if two of the doors were locked, one could still access the bedroom through the other door. (Supp. Hg. Tr. 60-61). Appellant presented no evidence that any of the upstairs doors were broken into by police.

{¶47} Further, no evidence supports Appellant's assertion that police searched upstairs and breached locked doors because they were searching for illegal drugs. The testimony established that officers searched the home to protect themselves from others who may be in the house and pose a threat to their safety. They were informed of Appellant's criminal history and the arrest warrant for drug trafficking and possible participation in a serious felonious assault with two other individuals and firearms. A juvenile ran from Appellant's house upon their entry and others were found in the home. The testimony also established that the illegal drugs found both in the bedroom on the main floor and in the upstairs bedroom were in plain view.

{¶48} Accordingly, we find no merit to Appellant's first assignment of error and it is overruled.

{¶49} In his second assignment of error, Appellant asserts:

THE TRIAL COURT ABUSED ITS DISCRETION BY IMPOSING A SENTENCE WELL IN EXCESS OF THE PARTIES' RECOMMENDATION,

OR

APPELLANT'S PLEA OF GUILTY WAS NOT KNOWINGLY MADE WHEN THE TRIAL COURT IMPOSED A SENTENCE WELL IN EXCESS OF THE

PARTIES' RECOMMENDED SENTENCE WITHOUT GIVING APPELLANT AN OPPORTUNITY TO WITHDRAW HIS GUILTY PLEA.

**{¶50}** Appellant contends that although the court advised him it was not required to accept the parties' joint recommendation of 2 years in prison for the felonious assault, he had every reason to expect the court to impose that sentence. He asserts the court's imposition of the 8-year maximum sentence was not justified. He also argues his guilty plea was unknowingly made because the trial court failed to allow him the opportunity to withdraw his plea after imposing the excessive sentence. He cites Justice Donnelly's dissent in *State v. Leasure*, 2024-Ohio-476, ¶ 5 and the Eighth District's decision in *State v. Jordan*, 2025-Ohio-5859 (8th Dist.).

**{¶51}** We find no merit to this assignment of error. The United States and the Ohio Constitutions require a defendant's plea to be made knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *State v. Engle*, 74 Ohio St.3d 525, 527 (1996). Crim.R. 11(C)(2) requires the trial court in felony cases to personally address the defendant and determine that he understands delineated constitutional and non-constitutional rights and their waiver before accepting a guilty plea. This includes the non-constitutional right to receive notice of the maximum penalty for the offenses to which he is pleading guilty. Crim.R. 11(C)(2)(a). A defendant seeking to invalidate his plea based on the trial court's failure to fully inform him of non-constitutional rights must show prejudice resulting from this failure. *State v. Sarkozy*, 2008-Ohio-509, ¶ 22. Prejudice is established by showing that the plea would not have otherwise been made. *State v. Dangler*, 2020-Ohio-2765, ¶ 16.

**{¶52}** A trial court is not bound by a jointly recommended sentence. *State v. Underwood*, 124 Ohio St.3d 365 (2010). A court may deviate from the recommended sentence and impose a greater sentence than recommended. *Id.; State v. Frye*, 2025-Ohio-569, ¶ 21 (7th Dist.). However, before imposing a longer prison sentence than recommended, the court must inform the defendant of the applicable penalties and the possibility of imposing a sentence greater than that recommended. *State v. Jordan*, 2024-Ohio-2361, ¶ 23 (8th Dist.).

**{¶53}** At the beginning of Appellant's plea hearing, the trial court explained that the plea agreement "has you pleading guilty to Count IX Felonious Assault; that's a felony

of the second degree, which means the maximum sentence that can be imposed is eight years in prison." (Plea Tr. 3). The trial court also noted Exhibit A was attached to the plea petition, which was the joint recommendation of the parties that Appellant serve two years in prison for that offense. (Plea Tr. 3). The trial court stated on the record:

> THE COURT: All right. Do you understand, one: That that is a recommendation of this Court; that the Court is not required to follow that?
>
> THE DEFENDANT: Yes.

(Plea Tr. 3). The court also set forth the parties' agreement for the drug possession offense and its maximum sentence. (Plea Tr. 4-5). Appellant indicated he understood the charges and the maximum sentences. (Plea Tr. 4-6). Thus, the court informed Appellant of his maximum potential sentence and that it was not bound by any agreed-upon lesser sentence between Appellant and the prosecution.

{¶54} The trial court informed Appellant again of the potential eight-year sentence after he entered his guilty plea. (Plea Tr. 16). Appellant stated he still desired to enter a guilty plea. (Plea Tr. 16). The court reiterated that Appellant made a guilty plea to "Felonious Assault . . . where he faces up to eight years in prison." (Plea Tr. 16). The court indicated it had informed Appellant of all possible penalties. (Plea Tr. 16).

{¶55} While Appellant cites to the dissenting opinion in *State v. Leasure*, 2024-Ohio-476, the majority of the Ohio Supreme Court declined to accept the jurisdictional appeal. Further, Justice Kennedy wrote a concurrence specifically to address Justice Donnelly's dissent. *Leasure* at ¶ 1 (Kennedy, C.J., concurring). Justice Kennedy explained that they could not address jointly recommended sentences and why they may be illusory in plea agreements because the propositions of law concerned the ineffectiveness of counsel when the trial court granted the defendant's motion to withdraw his guilty plea at the same time that it denied his counsel's motion to withdraw from representation. *Id*. at ¶ 2. Justice Kennedy also concluded that contrary to Justice Donnelly's assertion, *Leasure* was not the "perfect example" of the illusory promises of a jointly recommended sentence in a plea agreement because Leasure acknowledged he understood the trial court was not required to impose the jointly recommended sentence. *Id.* at ¶ 3.

**{¶56}** The case cited by Appellant*, State v. Jordan,* 2024-Ohio-2361 (8th Dist.) is also dissimilar to his case. There, the trial court sentenced the defendant to 32 years in prison, which was double the jointly recommended sentence. *Id*. at 17. The appellate court acknowledged a trial court does not err when it forewarns a defendant of the penalties and the fact that it may impose a greater sentence than that which formed the inducement for his guilty plea. *Id*. at ¶ 23. However, the appellate court held the trial court erred in imposing a sentence that was double the jointly recommended sentence when it created a reasonable expectation in the defendant that it was going to sentence him to the jointly recommended sentence. *Id*. at ¶ 29. The appellate court further held that the trial court's desire to proceed directly to sentencing without a presentence investigation report reinforced the defendant's reasonable expectation that he was going to receive the jointly recommended sentence. *Id*. The *Jordan* Court cautioned that trial courts should avoid the appearance of a "bait and switch" when deviations from a jointly recommended sentence occur when a defendant has a reasonable expectation that the court will impose that sentence. *Id*. at ¶ 32.

**{¶57}** In the instant case, the trial court informed Appellant three times that he faced up to 8 years in prison and explained it was not bound by agreed-upon sentencing recommendations. (Plea Tr. 4-6, 16). The trial court also ordered a presentence investigation report and a victim impact statement. (Plea Tr. 18). The court did not proceed directly to sentencing, as in *Jordan.*

**{¶58}** At Appellant's sentencing, the court referred to the presentence investigation report, Appellant's criminal history, which included violent crimes, and three of four times where Appellant was placed on community control and it was terminated due to violations by Appellant. (Sent. Tr. 5, 8-9). The court noted the fourth community control placement was pending termination based on the current crimes to which he pled no contest and guilty. (Sent. Tr. 8). The court found Appellant would continue to commit violent crimes and it could not see how it "could impose the minimum sentence on yet another felonious assault, including your background of attempted murder." (Sent. Tr. 6). The court stated it had applied the proper sentencing factors and it was not accepting the 2-year sentencing recommendation. These circumstances are not similar to those in *Jordan*. They also do not constitute a "bait and switch" by the trial court.

{¶59} We also find no merit to Appellant's assertion that the trial court should have given him an opportunity to withdraw his guilty plea after sentencing him to the maximum sentence for felonious assault. The trial court did not proceed directly to sentencing and had informed Appellant that it was not bound by the sentencing recommendation and Appellant faced up to 8 years in prison for the felonious assault offense.

{¶60} Accordingly, we find that Appellant's second assignment of error lacks merit and is overruled.

{¶61} In sum, we find the trial court properly denied Appellant's motion to suppress evidence discovered by law enforcement when they entered Appellant's home. Law enforcement were justified in performing a protective sweep of the main floor and upstairs. As to the main floor, law enforcement knew Appellant had a violent criminal history, he had an arrest warrant outstanding for involvement in a serious felonious assault with other individuals and possibly firearms, and a juvenile ran out of the house immediately preceding law enforcement executing the warrant. Upon breaching the front door, Officer Kubat also believed that he observed movement in the room that he entered. He encountered individuals and observed drugs in plain view on the floor.

{¶62} Law enforcement was also justified in performing a protective sweep of the upstairs. While the protective sweep occurred on a separate floor from where Appellant was detained and arrested, danger persisted to law enforcement from someone possibly hiding upstairs. Officer Kubat found others on the main floor and law enforcement knew Appellant had an outstanding warrant for felonious assault which caused serious physical injury and involved others and possibly firearms. They also knew Appellant had a violent criminal history and they had observed a juvenile running from the house immediately before executing the warrant.

{¶63} In addition, the court did not commit error by rejecting the parties' agreed sentencing recommendation. The court informed Appellant three times of the maximum term he faced and informed him it was not bound by the recommendation. The court also ordered a presentence investigation report and did not proceed directly into sentencing after the plea hearing.

Case Nos. 25 BE 0038, 25 BE 0042

{¶64} For the reasons stated above, the trial court's judgment is hereby affirmed.

Robb, J., concurs.

Dickey, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**